(No. 82374.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SAMUEL MORGAN, Appellant.

*Opinion filed September 23, 1999.*

502

504

HARRISON, J., concurring in part and dissenting in part.
BILANDIC, J., joined by HEIPLE, J., dissenting.

Michael K. Fridkin, Matthew J. O'Hara, J. Samuel Tenenbaum and Ann M. Spillane, of Sachnoff & Weaver, Ltd., and Martin S. Carlson, of the Office of the State Appellate Defender, all of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Arleen C. Anderson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Defendant, Samuel Morgan, was charged with two counts of murder and with aggravated kidnaping and rape. Following a jury trial in the circuit court of Cook County, defendant was found guilty of all charges. Defendant waived his right to a jury for the sentencing phase of the proceedings, and the circuit court found defendant eligible for the death penalty on the basis that he was convicted of murdering two individuals. Ill. Rev. Stat.

1981, ch. 38, par. 9—1(b)(3). The court then determined that no factors in mitigation were presented to preclude imposition of the death penalty and sentenced defendant to death for the murders. The circuit court also imposed concurrent extended prison terms (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a)) of 60 years for the rape and 30 years for the aggravated kidnaping. On direct appeal, this court affirmed defendant's convictions on all charges, and affirmed his sentence of death. This court also vacated the extended-term sentences imposed for rape and aggravated kidnaping and, pursuant to Supreme Court Rule 615, reduced defendant's sentence for rape to 30 years and his aggravated kidnaping sentence to 15 years. *People v. Morgan*, 112 Ill. 2d 111 (1986). The United States Supreme Court subsequently denied defendant's petition for writ of *certiorari. Morgan v. Illinois*, 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329 (1987).

Defendant thereafter filed a petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994)), challenging his convictions and death sentence. The circuit court dismissed all claims presented in defendant's post-conviction petition without an evidentiary hearing, with one exception. The court granted an evidentiary hearing on defendant's allegation that his trial counsel, Lawrence Levin, was ineffective because he failed to investigate and present certain mitigation evidence at sentencing. Following the evidentiary hearing, the circuit court denied defendant relief on this claim as well. This appeal followed.

## BACKGROUND

This court previously detailed the evidence presented at defendant's trial in our opinion on direct appeal. See *People v. Morgan*, 112 Ill. 2d 111 (1986). Therefore, we reiterate only those facts which are germane to the issues raised in this appeal. We set forth in some detail the

facts relating to defendant's sentencing hearing and the evidence presented in the post-conviction proceedings.

Defendant was charged with the murders of William Motley and Kenneth Merkson, and the aggravated kidnaping and rape of Phyllis Gregson. On the afternoon of January 27, 1982, defendant visited his longtime friend, Elijah Prater, at Prater's apartment at 1627 West Lawrence Avenue in Chicago. Accompanying defendant to Prater's apartment were Motley and Merkson, two friends of defendant. The evidence presented at trial showed that, after the trio arrived at Prater's apartment, all four men used various drugs and alcohol. Another friend of Prater, Phyllis Gregson, arrived at Prater's apartment sometime after 8 p.m.

The four men and Gregson spent the night at Prater's apartment. At approximately 11:30 a.m. on January 28, Motley, Gregson and defendant were in the apartment's front room. The evidence showed that Motley was sitting on a couch, talking on the telephone, and looking through a small, black telephone book. As he was making phone calls, Motley had a .357 Magnum handgun tucked under his leg. Defendant was sitting on a chair with a shotgun across his lap. Prater and Merkson were in the kitchen.

At that point, defendant instructed Gregson to remove her clothing and dance for him. Gregson refused, and Motley, who was still sitting on the couch, made an unknown comment to defendant. Defendant, who was between six and seven feet away from Motley, aimed the shotgun at him and fired. Motley landed on the floor with a fatal shotgun wound to the chest. Defendant then removed the handgun from Motley's body and placed the gun in his own waistband.

Defendant thereafter went into the kitchen and told Prater and Merkson to come into the front room and clean up Motley's body. Merkson removed money, marijuana, and the black telephone book from Motley and

gave them to defendant. Defendant looked at the names in the book, asked if anyone knew the listed individuals, and then placed the book in his pocket. Defendant said that he wanted to get Motley's body out of the apartment and told Prater and Merkson to pull the drawer out of a bedroom dresser to determine if the body would fit inside. Although Motley's body was bent and tied with a rope, the dresser drawer would not accommodate the body. Prater and Merkson then stuffed Motley's tied body into a laundry bag and wrapped it inside a mattress. Defendant then instructed Gregson to clean Motley's blood from the floor, which she did.

At approximately 11:45 a.m., defendant sent Prater to a liquor store to buy something to drink, told Prater to put gas in Prater's car, and instructed him to park the car at the rear of the apartment building. Prater ran the errands and returned to the apartment approximately 15 minutes later. Upon Prater's return, Gregson was washing dishes in the kitchen, and defendant was sitting in the dining room with the shotgun in his lap and the handgun tucked into the waistband of his pants. Merkson was walking around the apartment making jokes. Prater gave defendant the liquor he purchased and the men took a few drinks. Merkson continued to make jokes until defendant told him to stop joking and to remove Motley's body from the apartment. Merkson and Prater then moved Motley's body, wrapped inside the mattress, to the center of the room. When Merkson made another remark, defendant chased Merkson into the front room, where they started to argue. After hitting Merkson in the head with the butt of the handgun, defendant again instructed Merkson and Prater to remove the body from the apartment. Merkson made another remark to defendant and defendant told Merkson to get down on his knees and face the floor. Prater testified that he saw defendant point the handgun at Merkson's head from a

distance of four to five feet. Prater then turned to face the wall. Prater heard a shot and turned back to see Merkson's body on the floor and defendant, holding the handgun, standing beside it. Gregson also testified that as she emerged from the kitchen she saw the handgun in defendant's hand as he stood near Merkson's body. Defendant ordered Gregson to clean up Merkson's blood, and instructed Prater to get the body out of the apartment. As Prater began to tie up Merkson's body with his belt, defendant came up behind Prater and began shooting at him. Prater testified that he felt a bullet pass by his head. Prater then ran through the kitchen and out the back door of the apartment.

Defendant, who was now alone with Gregson in the apartment, ordered her into the bathroom. Gregson complied, and locked the bathroom door behind her. After the passage of between 5 and 10 minutes, defendant ordered her out of the bathroom. When she emerged, she saw defendant was still in possession of the handgun, although she did not observe the shotgun. Defendant took Gregson by the arm and they left the apartment together at approximately 1:30 p.m.

In the meantime, Prater's downstairs neighbor, Frank Blume, had called the police. Blume, who had heard several loud shattering sounds coming from Prater's apartment during the morning, testified that the last loud blast, which occurred at about 1:15 p.m., caused a hole in the ceiling in Blume's front hallway. The police arrived shortly after 1:30 p.m., and, upon entering Prater's apartment, discovered the bodies of Motley and Merkson. From the apartment the police recovered a loaded shotgun, a fingerprint from a dresser drawer later identified as defendant's, and a bullet from the floor. The police also recovered a bullet from Blume's apartment.

Gregson testified that after leaving Prater's apartment, defendant, who was still armed with the handgun,

ordered her into his car and drove her to the South Shore Motel, where he checked in under the alias of Joseph Thurston. Defendant, who had Gregson by the arm, then led her to a motel room, where he began to undress her. Although Gregson told defendant that she did not want to have sex with him, defendant completed removing her clothes, pushed her onto the bed, and had sexual intercourse with her. Thereafter, defendant, who was still armed with the handgun, escorted Gregson by the arm to his car. A motel employee testified that he observed defendant pointing a gun to Gregson's head. Defendant, upon seeing the employee, aimed the gun at him and began chasing him. As the employee ran towards the motel lobby, defendant ceased the chase, again took Gregson by the arm, and pushed her headfirst into his car. Soon thereafter, defendant stopped the car and told Gregson to get out. After warning her not to tell anyone what had happened, defendant drove off at a rapid rate of speed. Defendant was arrested the next day, January 29, 1982. Later that same day, Prater contacted the police and informed them that defendant was responsible for the deaths of Merkson and Motley. Prater's statements to the police were subsequently confirmed by Gregson.

At trial, expert testimony showed that the handgun recovered from defendant at the time of his arrest had fired the bullets recovered at the apartment building. A plastic bag defendant dropped prior to his arrest contained a black notebook, which Prater and Gregson described at trial as being the one Merkson gave defendant from Motley's body.

A jury found defendant guilty of all charges on May 3, 1983. Defendant waived a sentencing jury, and the trial court judge conducted defendant's capital sentencing hearing on June 14, 1983. At the eligibility phase of the sentencing hearing, the State introduced into evidence a certified copy of defendant's birth certificate

showing that he was over 18 years of age at the time of the murders, and argued that defendant was eligible for the death sentence on the basis that he had been convicted of murdering two individuals. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3). Defense counsel presented no evidence regarding defendant's eligibility, but argued that because the Illinois death penalty statute was unconstitutional, "the proceedings *** in terms of the death penalty hearing should not be held." Based upon the evidence offered, the trial court judge concluded that defendant was eligible for the death penalty.

The trial court judge then heard evidence relevant to aggravation and mitigation. In his opening remarks, the prosecutor focused upon defendant's "consistent history of unprovoked violence," and argued that, for most of his adult life, defendant "has been involved in violent confrontations with people, most of them innocent people."

Defense counsel, in his opening statement, engaged in a religious appeal to the judge. Counsel stated: "What I can bring forth before this court, at this time, is the knowledge and wisdom of Catholicism, the Pope, the archbishops." Although counsel admitted that "there can be no question that [defendant] has been found guilty of a crime," counsel argued that by seeking the death penalty, the State "is proposing to this court *** that this court shall act in the stead of a God, that this court, with its supervising powers, shall become the almighty and terminate a man's life." Concerning mitigation evidence, counsel stated that he would "let the evidence speak for itself, insofar as mitigation is concerned," and he promised the trial court judge that "[y]ou will hear from [defendant]. You will hear from kin of [defendant]. You will hear regarding medical testimony as to the problems medically that the defendant has had and still suffers from."

During the State's case in aggravation, the State introduced defendant's criminal history, which dated back to 1965, and presented the testimony of five witnesses. The State's first witness was Earnest Powell, who testified that as he was walking to his car one evening in November 1965, he was approached by defendant, who had a gun. Defendant told Powell to get out of his car, whereupon Powell's wallet and car were stolen. Defendant was convicted of armed robbery and sentenced to three months' imprisonment and five years' probation.

While defendant was on probation for the armed robbery of Powell, defendant was arrested in May 1967 for the aggravated battery of Joseph Smoot. Smoot testified that he was playing softball at Washington Park when defendant, whom Smoot had never met, hit Smoot in the back of his head with a baseball bat. Defendant pled guilty to aggravated battery and was sentenced to three to five years' imprisonment. Defendant was also sentenced to a concurrent term of three to five years' imprisonment for jumping bail in connection with this offense. Finally, defendant was sentenced to an additional concurrent term of three to eight years' imprisonment for violating the provisions of his original probation for the previous armed robbery conviction.

In October 1967, defendant was convicted of aggravated battery, intimidation and mob action in connection with a race riot at Cook County jail. James Czernek, who had been incarcerated at Cook County jail, testified that defendant, who was an organizer of the race riot, had instructed all white prisoners to kneel on the floor in the middle of the jail's day room. Defendant then struck Czernek in the throat with a stick. For these offenses, defendant was sentenced to a term of three to five years' imprisonment, to run concurrently with the other sentences mentioned above.

Chicago Police Officer John Gallagher also testified

in aggravation. He stated that in October 1976 he investigated an armed robbery at defendant's apartment and learned that defendant had shot two females with a sawed-off shotgun. However, on cross-examination, Gallagher acknowledged that the State subsequently moved to strike, with leave to reinstate, the aggravated battery and unlawful use of weapons charges against defendant stemming from the incident.

The State's final witness in aggravation was Chicago Police Officer Paul Zacharias. In November 1981, he stopped defendant's car for failure to display a state vehicle registration sticker. When defendant failed to produce a valid driver's license, he was placed under arrest. As Officer Zacharias attempted to handcuff defendant, Zacharias' partner observed a scale and two bags containing a white powdered substance on the front seat of defendant's car. Defendant punched Officer Zacharias in the face with his fist and also hit and shoved the officer's partner. Defendant then returned to his car and sped off, with the officers in pursuit. Defendant thereafter left his vehicle, and the officers gave chase on foot. Ultimately, defendant was apprehended and placed under arrest for possession of a controlled substance, possession with intent to deliver, and battery. The case was still pending at the time of the hearing in aggravation in the case at bar.

The mitigation case presented by defense counsel consisted of two witnesses, whose testimony comprised 10 pages of transcript. Defendant's girlfriend, Rosemary Thomas, related that she met defendant in 1972, and they lived together from 1974 until the time of defendant's arrest in this matter. Thomas testified that defendant played with her two small children, baked cookies with them, helped them with their homework, and instructed them not to argue with one another. She also stated that defendant provided her with moral support

when she experienced difficult times. Thomas testified that she benefitted from her time together with defendant, and that she and her children loved him.

Defense counsel next called defendant's mother, Josephine Rogers, who testified that she loved defendant. Then, the following exchange, which were the only references developed by the defense relating to defendant's brain damage, took place between Rogers and defense counsel Levin:

"Q. Now, Miss Rogers, when [defendant] was a young man, approximately eight years of age, did he get hurt or was he involved in an incident?

A. Yeah, he got hurt. He started having seizures at the age of eight years old. He's got a spot on his brains now, and he should be receiving medical care now which [ sic] he's grown, and I can't make him go.

Q. When he doesn't take medical care or when he doesn't receive his medicine, does he sometimes do things that he's not responsible for?
 ***
A. He—when he doesn't take his medicine, he have these seizures, and he's a complete blank. You know, he don't know what he's doing.

Q. Since eight years old until today's date, has he had problems as a result of the spot on his brain?

A. I don't understand what you mean, problems?

Q. Well, as his mother, you are aware or you know that unless he takes his medication, he does have problems functioning?

A. Right.

Q. You've heard, Mrs. Rogers, the fact that we've been here—every day during the jury trial—and you heard the things that the jury found [defendant] doing. Does that in anyway diminish the love for your son, Ma'am?

A. No way."

After the completion of Rogers' testimony, defense counsel requested that the court grant a continuance to the next day because there were "certain other witnesses" that counsel stated that he wanted to call. The

trial court judge denied this request, noting that the date for the sentencing hearing had been agreed to by both sides and the hearing was taking place over one month after defendant had been found guilty by the jury. Defense counsel then stated that because the court had not allowed a continuance, defendant had asked him to bring specific matters to the attention of the judge. In connection with defendant's request, counsel drew the court's attention to the contents of a 1978 presentence investigation report regarding defendant, and elaborated that "defendant has been receiving medication and had prior instances involving a spot on the brain which was supposed to have been traceable to an injury which occurred when he was eight years old. There is information that the defendant was treated and had been utilizing particular medication while during his incarceration."

In closing argument at the aggravation-mitigation stage of the sentencing proceedings, the prosecutor commented to the court that defendant presented "two angles" of mitigation: "that the defendant is a loved person, that his mother loves him, that his girlfriend loves him, children love him *** [and] [s]econdly that the defendant suffered some medical incident when he was eight years old that causes him to have blank spots." The prosecutor, focusing upon defense counsel's promise during opening arguments that medical evidence would be presented regarding defendant's medical problems, observed that the court had "not heard any medical testimony" other than "certain referrals in the presentence investigation," and that there was no evidence presented "as to whether this medical condition would, in any way, mitigate or take away from the defendant's conscious behavior when he performed certain acts."

Defense counsel, in his closing argument at the aggravation-mitigation stage of the sentencing proceedings, acknowledged the "heinous nature of the events

which took place," and then again engaged in a primarily religious appeal to the judge to spare defendant's life, stating: "If human beings, such as yourself, feel it appropriate to rectify the wrong and [mete] out a punishment, which is an eventuality of punishment, which is meted out by somebody else who is far more knowledgeable than you or I, who is the person who decides. The giver of life then—then I would suggest that this court has taken a step towards immortality which should not be done."

In speaking of the mitigation evidence presented in support of defendant, counsel stated: "I would submit to this court when somebody has suggested that there is no mitigation, there is no right, that there is no love, they're wrong. Mothers love their children. Wives love their husbands. Fathers love their children. But love is espoused by somebody much bigger than somebody who is not here today." Counsel then concluded that "[m]itigation many times is not something that can be directly spelled out by the mouth, by the words. Mitigation is not something which individuals come before this Court and say, I apologize, I forgive, I have sinned. Mitigation is the process of individuals. Mitigation is the love that is shown by individuals. Mitigation, in fact, Judge, is the being of human beings."

On June 14, 1983, the trial judge, finding no mitigating factors sufficient to preclude the imposition of the death penalty, sentenced defendant to death on the murder charges and to concurrent extended prison terms of 60 and 30 years for rape and aggravated kidnaping. As part of his sentencing decision, the trial court judge stated that he took into consideration the factors of defendant's background, as well as the circumstances of the crime. Concerning defendant's background, the judge stated that it was "one of all criminal conduct and activity," except for the facts related by defendant's girlfriend.

As to the circumstances of the crime, the judge observed that "[t]here wasn't any rhyme, there wasn't any reason" to the "senseless killings." The trial court judge stated that "I might say that this could be the part that could be very distasteful to this court or to this judge," and that "I'm not a great proponent of the death penalty," but "I have a job to do, and I'm going to do my job. I see no other sentence."

Subsequent to this court's consideration of defendant's direct appeal (*People v. Morgan,* 112 Ill. 2d 111 (1986)) and the United State's Supreme Court's denial of defendant's petition for writ of *certiorari* (*Morgan v. Illinois,* 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329 (1987)), defendant, through the Cook County public defender's office, filed a petition for post-conviction relief in January 1988. The post-conviction petition alleged that defendant's constitutional rights were violated during his trial, sentencing, and direct appeal. Between July 1988 and April 1993, defendant underwent a series of neurological, psychological, neuropsychological and social history evaluations. In March 1993, the State filed a motion to dismiss defendant's post-conviction petition. Defendant, again through the public defender's office, filed an amended petition for post-conviction relief in July 1993. The State filed an amended motion to dismiss in October 1993. In August 1994, the public defender's office was granted leave to withdraw as defendant's post-conviction counsel, and defendant's present counsel was appointed. On July 3, 1995, present counsel filed a second amended petition for post-conviction relief. A supplement to the second amended petition for post-conviction relief, as well as a second amended motion to dismiss, were also filed.

Defendant's second amended petition raises numerous claims of ineffective assistance of counsel at trial, sentencing, and on direct appeal, in violation of defen-

dant's rights under the fourth, fifth, sixth, eighth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, V, VI, VIII, XIV), as well as his rights under article I, sections 2 and 11, of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 11). We set forth only those claims which are raised by defendant in this appeal. First, the petition alleged that defendant was denied effective assistance of counsel during trial and at the eligibility phase of sentencing because counsel failed to investigate and present certain defenses; failed to competently present the defense relied upon; was distracted by outside obligations; improperly admonished defendant concerning his right to testify; and failed to request exculpatory statements from the State. Second, the petition alleged that defendant was denied effective assistance of counsel during the aggravation-mitigation stage of the sentencing hearing because counsel failed to investigate and present mitigating evidence concerning defendant's organic brain damage and family background; failed to address mitigating circumstances in defendant's life during arguments at sentencing; allowed defendant to waive a sentencing jury in a manner not knowing, intelligent and voluntary; and failed to object to a presentence investigation report. Third, the petition alleged that defendant was deprived of the effective assistance of appellate counsel during his direct appeal.

In support of the allegations in his petition, defendant attached affidavits from several professionals, as well as copies of his medical records, school records, and arrest reports. Joanne Glass-Watson, a licensed social worker retained to investigate defendant's social history and background, submitted an affidavit detailing defendant's history of epileptic seizures beginning in infancy, defendant's "chaotic family system" that fostered both physical abuse and benign neglect of defendant's emotional needs, defendant's early exposure to alcohol and

drugs resulting in early addiction, and defendant's special learning needs which were not addressed by the school system. Glass-Watson concluded that "the combination of defendant's addiction and his entry into the adult world with extremely limited abilities renders his frequent contacts with the criminal justice system almost an inevitability. It also appears from the results of neurological testing that [defendant's] aggressive behavior may be directly attributable to his neurological problems."

Dr. Jonathan Pincus, former chairman of the neurology department at Georgetown University, also submitted an affidavit on defendant's behalf, wherein he concluded that "[a]t the time of the offenses, as a result of the significant level of neurological impairment exacerbated by the effects of cocaine, PCP, and alcohol, [defendant] was under extreme mental and emotional disturbance." Dr. Pincus further concluded that "[a]t the time of the offenses and throughout his life, [defendant's] aggressive and violent behavior was the direct result of brain damage. His aggressive impulses have also been engendered by abuse and his extreme paranoia is the result of abuse and brain damage. All of these factors are beyond his control."

Dr. Daniel J. Rybicki, a clinical psychologist, also submitted an affidavit on defendant's behalf, in which he stated that various tests indicate that defendant "is capable of displaying prosocial attitudes and behavior." Dr. Rybicki opined that defendant's brain deficits "have had profound effects on his daily life since his early childhood," leading to an "inability to perceive social situations correctly and act accordingly, [an] inability to control his behavior, and [an] inability to act rationally during stressful situations." Dr. Rybicki concluded: "In my opinion, which I hold to a reasonable degree of medical certainty in my profession, at the time of the offen-

ses, [defendant] was under extreme mental and emotional disturbance. At the time of the offenses, [defendant's] deficits *** significantly interfered with his ability to think logically and strategically and to understand the long term consequences of his actions. In addition, his capacity to conform his conduct to the requirements of the law was substantially impaired."

Also attached to defendant's petition were numerous affidavits from relatives and friends, many detailing defendant's history of seizures. The affidavits generally describe how, over the years, the affiants had noticed or heard from others that defendant stuttered, had seizures, had strange fainting or blacking-out episodes, was forgetful, used drugs on occasion, became violent for "no reason at all," acted "crazy and weird" in the police lockup after his arrest, and on occasion acted "hostile and paranoic." Further, the rape victim in this case, Phyllis Gregson, submitted an affidavit stating that at the time of the offenses, the four men were using drugs and drinking, and that immediately prior to the first shooting defendant "flipped out." The other eyewitness to the murders, Elijah Prater, also submitted an affidavit in which he stated that before the murders, defendant appeared to be "threatened" by the victims and that defendant believed the victims intended to kill him.

In June 1996, the circuit court ruled upon defendant's petition. We note that the post-conviction judge was not the same judge who presided over defendant's trial and sentencing due to the latter's retirement. Based upon the content of the affidavits attached to defendant's petition, the post-conviction judge determined that defendant had made a substantial showing of ineffective assistance of counsel only as to the allegation that defense counsel failed to investigate and present mitigation evidence during the capital sentencing hearing concerning defendant's organic brain damage and medical condition. The post-

conviction judge granted the State's motion to dismiss the remainder of defendant's petition without an evidentiary hearing.

The evidentiary hearing took place in October 1996. The post-conviction judge heard testimony from three witnesses presented by defendant and one witness presented by the State. Defendant's first witness was his sister, Ruby Roberts. Roberts related that their mother would often fly into rages, and would beat her children two or three times per week using items such as extension cords, ropes and sticks. Roberts testified that during the beatings their mother would be "out of control," and would only stop when the children cried. Roberts stated that defendant was beaten from age 3 to 16, and was beaten for a longer period of time than the other children because defendant would not cry. According to Roberts, as a result of the beatings defendant ran away from home as a teenager, spending time on the streets.

Roberts also testified concerning defendant's medical condition. She related that when he was young, defendant would often bang his head against the floor and walls. Defendant was often hospitalized during his youth, and he routinely suffered seizures involving thrashing and foaming at the mouth which lasted from 15 to 20 minutes per occurrence. Roberts testified that even after he left home, defendant continued to have seizures: he would be seen lying in the street, convulsing, and foaming at the mouth.

Roberts testified that her mother, who was deceased at the time of the post-conviction proceedings, hired Levin as defense counsel the same day defendant was arrested. According to Roberts, the first time Levin was informed of defendant's seizures by their mother was shortly after he was hired, and at that time Levin stated to her mother that he "would get on it right away." According to Roberts, midway through defendant's trial,

she attempted to speak with Levin in the hall of the courthouse, but he "brushed [her] off." Roberts testified that she wanted to remind Levin that defendant suffered from seizures and needed medical treatment in prison. Roberts stated that her mother followed Levin down the hall and repeated the same information to him. Roberts testified that Levin responded that "he was on top of it." Roberts further testified that neither Levin nor anyone from his office ever attempted to talk to her prior to the commencement of the trial. Furthermore, although she and her mother attended the trial on a daily basis, neither Levin nor anyone from his office attempted to speak to them at that time. Roberts stated that on the occasions she would try to speak with Levin during trial, Levin "would just dismiss me and walk away."

At the time of defendant's sentencing hearing, Roberts testified, she did not know the purpose of the court date. It was only when the judge stated that it was a death penalty hearing that she learned the purpose of the hearing. Before that day, she was not aware that defendant could be sentenced to death. Roberts further testified that counsel never asked her or her mother for names of people that could testify on defendant's behalf, never asked her or her mother about defendant's seizures, and never asked anyone about defendant's health.

Defendant's next witness at the post-conviction evidentiary hearing was Dr. Jonathan Pincus, former chairman of neurology at Georgetown University and chief of neurology at Georgetown University Hospital. Dr. Pincus testified that he personally examined defendant in 1990 and 1996, and studied defendant's medical and school records, as well as his social background. Dr. Pincus described defendant's history as the "most important part" of a neurological assessment, and observed that within defendant's history there were repeated mentions

of seizures that started when defendant was 20 months old and continued throughout his childhood. Based upon defendant's medical records, Dr. Pincus concluded that defendant's bout of meningo encephalitis at 20 months of age was the likely cause of defendant's brain damage, which led defendant to suffer seizures. Dr. Pincus testified that brain damage never goes away, and in defendant's case there is a correlation between his history of brain damage, medical history of seizures, and his learning disability.

Dr. Pincus related that defendant failed 6 of the 30 tests he was administered to determine the extent of the damage to the frontal lobes of his brain. According to Dr. Pincus, less than one percent of the population would fail this number of tests. Dr. Pincus concluded from these tests that defendant suffered from severe bilateral dysfunction of his frontal lobes, as well as from more diffused damage involving deep subcortical involvement. Dr. Pincus explained that the most important function of the brain's frontal lobes is to control judgment "so that a person can see the outcome of what they're thinking or doing." When the frontal lobes are damaged, the person has "extremely poor judgment" and his personality changes. When asked how the damage to the frontal lobes affects defendant's behavior, Dr. Pincus responded that the damage "makes him short tempered and unable to check his impulses."

Dr. Pincus testified that there was a definite link between the criminal conduct described during the aggravation portion of defendant's sentencing hearing and defendant's brain damage. Dr. Pincus stated that the "best example" of such a link was defendant's battery of Joseph Smoot, a man defendant did not know. According to Pincus, defendant's brain damage caused him to have a "paranoid thought concerning that person. [Defendant] felt that he was doing something that was justified and

he then behaved in a way which is to the objective observer *** completely irrational." Dr. Pincus explained that defendant's brain damage may cause him not to understand the consequences of his actions.

Dr. Pincus then focused upon defendant's behavior at the time of the murders. Based upon his review of the trial transcripts and the affidavits of people who saw defendant that night, Dr. Pincus was of the opinion that defendant was acting in a "paranoid or psychotic state where he was not in control of what he was doing, where he was not able to plan. He was not able to think clearly and *** [reacted to a stimulus] in an unthinking kind of a way. He was not deliberative. He was not being premeditative. *** He was not able to focus his judgment on the issues that were coming up at that time. He was *** excessively paranoid at the time. And he was excessively confused."

Dr. Pincus stated that the abuse suffered by defendant as a child, defendant's paranoia, and the drugs defendant was using at the time of the murders were all important factors in connection with his behavior. However, Dr. Pincus opined that defendant's brain damage was the "determining factor" in his behavior. According to Pincus, defendant's "brain damage gave these factors their significance," and if defendant "had no brain damage he would have been able to check [his impulses]." Dr. Pincus testified that defendant would not have conducted himself the way that he did at the time of the offenses if he did not have brain damage.

The final witness to testify on defendant's behalf during the post-conviction evidentiary hearing was Dr. Daniel J. Rybicki. Dr. Rybicki, a clinical psychologist, met defendant on three occasions, in 1988, 1989, and 1993, with each meeting lasting approximately three hours. Dr. Rybicki administered various psychological tests to defendant, which showed near-normal intellect, but also

evidenced a learning disability and problems with social judgment. Based upon his testing and examination of defendant's records, Rybicki concluded that defendant's brain damage was caused by encephalitis during defendant's infancy, and that the damage is permanent.

Dr. Rybicki diagnosed defendant with "frontal lobe impairments which are quite extreme." In describing the severity of defendant's brain damage, Dr. Rybicki testified that 98% of the general population has a more intact brain than defendant. Further, 85% of those individuals with brain damage have a brain which is more intact than defendant's. Dr. Rybicki also stated that due to the deficits in defendant's frontal lobes, defendant suffers from "paranoid ideation" and is impaired in his "ability to think in logical sequences." When asked whether defendant's behavior at the time of the offenses was affected by his brain damage and learning disabilities, Dr. Rybicki responded in the affirmative. Rybicki also noted that defendant's use of drugs and alcohol at the time of the offenses magnified his brain deficiency.

The sole witness called by the State during the post-conviction evidentiary hearing was defendant's trial counsel, Lawrence Levin. Levin testified that at the time he represented defendant, he had been a licensed attorney for 11 years and had previously tried two or three capital cases. Levin repeatedly testified that he had "no independent recollection based on the passage of time." Levin testified that although it was his practice to maintain a client's file for a period of time, he did not retain defendant's case file and had no idea where it was.

Although Levin stated that he could not independently recall defendant's case, he testified that under circumstances similar to those present in defendant's case, it was his "methodology and action to seek all witnesses who have information germane to a litigation hearing." Levin then responded in the negative to questioning by

the State as to whether defendant gave Levin any indication that defendant was suffering from mental illness or mental difficulties. Levin stated that defendant was able to converse with Levin without difficulty, and during his course of dealings with defendant, he never observed defendant blank out, lose his train of thought, mumble, appear impulsive and angry, or suffer seizures. Levin testified that although the 1978 presentence investigation report alluded to an incident when defendant was eight years old, there was no other suggestion that defendant was brain damaged. Levin further pointed to a 1983 presentence investigation report where there is no indication that defendant suffered from a medical condition.

On cross-examination, Levin stated that during his representation of defendant, "[t]o the best of my knowledge we had not received from the mother or anybody else the names of any doctors or treating physicians." Further, Levin could not recall when defendant's mother made him aware that defendant had a "spot on the brain" and suffered from seizures. Levin also could not recall if he interviewed defendant's sister, Ruby Roberts, but stated that "my practice has been to interview all available witnesses *** who can engender or give some degree of help relative to a defendant at a mitigation hearing." Levin stated that he was unaware whether defendant was under any medication while in jail. Finally, because Levin was unable to consult defendant's case file, he could not recall if during his representation of defendant he had reviewed defendant's school records, hospital records, or police file.

Upon conclusion of the evidentiary hearing, the postconviction judge found that defense counsel's performance at trial and sentencing was not deficient because it did not fall below an objective standard of reasonableness as measured by reference to professional norms. The judge found that Levin "did an adequate job based

upon the information he had," and that there was not sufficient evidence in the record "to indicate that the attorney should have known about any prior or current mental conditions since, in fact, everything that I have heard indicates that this was a prior mental condition." The post-conviction judge further determined that even if Levin's performance had been deficient, defendant did not suffer any prejudice. In view of the nature of defendant's crime and his prior criminal record, the judge concluded that the outcome of defendant's capital sentencing hearing would not have been any different if, in fact, testimony of defendant's medical condition had been presented.

Defendant now appeals the dismissal of the claims in his post-conviction petition. With respect to the post-conviction claims dismissed without an evidentiary hearing, defendant requests alternatively a new trial, a new sentencing hearing, or remand for an evidentiary hearing on those claims. Defendant also appeals the post-conviction judge's finding following the evidentiary hearing that defense counsel was not deficient in failing to investigate and present potential mitigation evidence during defendant's capital sentencing hearing. Defendant also challenges the post-conviction judge's finding that, even if defense counsel's performance was deficient, defendant suffered no prejudice as a result of counsel's failure to present the potential mitigation evidence. Defendant contends that the court's findings are manifestly erroneous and a new sentencing hearing should be ordered. Alternatively, defendant asserts that this court should direct the trial court to reopen the hearing on count III to permit a full development of the facts.

## ANALYSIS

The Illinois Post-Conviction Hearing Act provides a mechanism by which criminal defendants can assert that their convictions were the result of a substantial denial

of their rights under the United States Constitution, the Illinois Constitution, or both. See 725 ILCS 5/122—1 (West 1994). An action for post-conviction relief is a collateral proceeding, not an appeal from the underlying judgment. *People v. Brisbon*, 164 Ill. 2d 236, 242 (1995). In order to be entitled to post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment being challenged. *People v. Tenner*, 175 Ill. 2d 372, 377 (1997).

The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously upon direct appeal. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997). The doctrine of *res judicata* bars consideration of issues that were raised and decided on direct appeal. *Towns*, 182 Ill. 2d at 502; *Griffin*, 178 Ill. 2d at 73. Issues that could have been presented on direct appeal, but were not, are waived. *Towns*, 182 Ill. 2d at 503; *Griffin*, 178 Ill. 2d at 73.

An evidentiary hearing is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *Towns*, 182 Ill. 2d at 503. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true. *Towns*, 182 Ill. 2d at 503. A trial court's determinations regarding the sufficiency of the allegations contained in a post-conviction petition are reviewed *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 389 (1998). Determinations made by the trial court subsequent to an evidentiary hearing will not be disturbed unless manifestly erroneous. *Towns*, 182 Ill. 2d at 503.

Before this court, defendant raises several claims of ineffective assistance of counsel at trial, sentencing, and upon direct review, in violation of his rights under both the United States Constitution and the Illinois Constitution. The constitutional guarantee of the assistance of counsel (U.S. Const., amends. VI, XIV) includes the right to effective assistance of counsel (*Cuyler v. Sullivan*, 446 U.S. 335, 344, 64 L. Ed. 2d 333, 343-44, 100 S. Ct. 1708, 1716 (1980)), both at trial and on a defendant's first appeal as of right (*Evitts v. Lucey*, 469 U.S. 387, 396-97, 83 L. Ed. 2d 821, 830-31, 105 S. Ct. 830, 836-37 (1985)). Claims alleging ineffective assistance of counsel are judged under the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Coleman*, 183 Ill. 2d at 397.

To prevail on a claim asserting that counsel was not effective, a defendant must first establish that his defense counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. A defendant must establish that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Because judicial scrutiny of a defense counsel's performance is highly deferential, "a defendant must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *Coleman*, 183 Ill. 2d at 397.

If a defendant establishes that defense counsel's representation fell below an objective standard of reasonableness, then a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

A defendant must satisfy both prongs of the *Strickland* test before he or she can prevail on a claim of ineffective assistance of counsel. However, if the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient. *Griffin*, 178 Ill. 2d at 74.

### Guilt and Eligibility Phases of Trial

Defendant contends that his post-conviction petition makes a substantial showing that he was deprived of his constitutional right to effective assistance of counsel at the "guilt and eligibility phases" of his trial. According to defendant, because counsel was ineffective in failing to investigate and present evidence of defendant's brain damage and neurological impairments, defendant's sole "defense" was to imply that the State's two witnesses to the murder, Phyllis Gregson and Elijah Prater, were not believable and were accomplices to the crimes. Defendant observes that no evidence was provided at trial which was probative of defendant's mental state at the time of the murders, and contends that witnesses were available who could have provided testimony concerning what defendant describes in his brief as his "bizarre behavior in and around the time of the homicides," defendant's "intake of drugs and alcohol that night and morning," and defendant's "extreme fear of Kenneth Merkson and William Motley." According to defendant, defense counsel "failed to competently present the defense *** relied upon," and should have investigated and pursued a mental state defense based upon extreme mental and emotional disturbance, and/or intoxication. Defendant also contends that counsel could have raised

self-defense, or could have pursued a voluntary manslaughter claim based upon an unreasonable belief in self-defense, and/or sudden and intense passion.[1] According to defendant, absent these errors, he would not have been found eligible for the death penalty because his eligibility was based upon the statutory provision requiring a finding of intent to kill two or more individuals. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).

Defendant, in his brief to this court, primarily cites to various passages from the affidavits of Gregson and Prater, including that defendant "flipped out" the night before the shootings, that defendant "snapped in and out of periods of extreme paranoia," that defendant believed "devils and demons'' were after him, and that all four men in the apartment were "drinking whisky, smoking marijuana, *** snorting cocaine" and possibly taking PCP during the time preceding the murders. Defendant also relies upon statements in Prater's affidavit that during the time in the apartment, defendant "appeared extremely threatened by [the victims]," that Motley made "at least five telephone calls throughout the night" in which he "whispered privately" so that no one else could hear, and that defendant stayed awake all night "because he believed that Motley and Merkson were going to kill him." Defendant additionally relies upon the affidavit of his girlfriend, Rosemary Thomas, that defendant called her several times from Prater's apartment, that he "sounded very strange" and that he told her that "devils and demons were after him." Finally, defendant cites to the affidavit of his longtime friend, Van J. Ross, who visited defendant at the police station shortly after his arrest for the murders and avers that a police officer in

---

[1] We note that defendant does not argue that his counsel should have pursued an insanity defense or an instruction requesting a finding of guilty but mentally ill.

charge of the lockup stated that defendant had been acting "crazy" and "weird."

After carefully reviewing the affidavits attached to defendant's petition, and taking all well-pleaded facts as true, we cannot say that defendant has made a substantial showing that there is a reasonable probability that defendant would not have been convicted of first degree murder if this testimony had been presented.

We find that defendant has failed to make a substantial showing that there is a reasonable probability that the outcome of his trial at the guilt-innocence phase would have been different had defense counsel raised the defense of intoxication. While voluntary intoxication is normally not a defense to the commission of a crime, evidence that the intoxication was so extreme as to suspend the power of reason may be used to negate the existence of the mental state which is an element of the crime. Ill. Rev. Stat. 1981, ch. 38, par. 6—3(a); *People v. Lucas*, 132 Ill. 2d 399, 435 (1989). In light of the facts of the case at bar, there is no reasonable likelihood that testimony that defendant was intoxicated at the time of the murders would have successfully established the defense of voluntary intoxication or reduced defendant's culpability to provide a basis for a conviction of voluntary manslaughter. Indeed, nowhere in the affidavits relied upon by defendant is there evidence that defendant's purported intoxication was so severe that he could not form the requisite intent to support a first degree murder conviction. Our conclusion is further supported by the fact that although evidence was in the record and presented to the jury that defendant had consumed drugs and alcohol at and around the time of the crimes, this evidence did not alter the jury's finding of culpability.

We also reject defendant's contention that he made a substantial showing that there is a reasonable likelihood that the result of his trial at the guilt-innocence phase

would have been different had counsel investigated and presented evidence that defendant acted in self-defense, in an unreasonable belief in the need for self-defense, or under a sudden and intense passion resulting from serious provocation.

Section 7—1 of the Criminal Code of 1961 states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another ***." Ill. Rev. Stat. 1981, ch. 38, par. 7—1.

It is well established that in order to raise a claim of self-defense, a defendant must present evidence supporting each of the following elements which justify the use of force in defense of a person: (1) that force had been threatened against defendant; (2) that defendant was not the aggressor; (3) that the danger of harm was imminent; (4) that the force threatened was unlawful; (5) that defendant actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary; and (6) that defendant's beliefs were reasonable. See *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

Defendant, relying upon statements in Prater's affidavit that defendant "appeared extremely threatened by [the victims]" and that defendant "believed that Motley and Merkson were going to kill him" based upon phone calls that Motley made in which he "whispered," contends that he was prejudiced by defense counsel's failure to seek an instruction on self-defense. We disagree. There is no evidence of record that, at the time of the shootings, either Merkson or Motley made any threats of use of unlawful force against defendant that would lead a person to reasonably believe that there was

an imminent danger of death or great bodily harm that required the use of deadly force in self-defense. It is undisputed that Motley was shot as he was sitting on the couch making phone calls, and that Merkson was shot in the back of the head after he complied with defendant's instructions to kneel on the floor. Although defendant emphasizes the fact that Motley was armed with a handgun, defendant overlooks the fact that at the time of Motley's murder defendant was also armed with a shotgun. In addition, at the time of Merkson's shooting, Merkson was unarmed and defendant was in possession of the shotgun as well as Motley's handgun. Defendant's argument regarding self-defense is therefore untenable.

We also reject defendant's contention that he has made a substantial showing that he was prejudiced by defense counsel's failure to pursue an instruction for voluntary manslaughter. At the time of defendant's trial, the statute provided that an instruction on voluntary manslaughter was available if there was evidence that the person had an actual but unreasonable belief that the circumstances required the use of deadly force as a means of self-defense, or that the killing occurred while he was acting under sudden and intense passion resulting from serious provocation. Ill. Rev. Stat. 1983, ch. 38, pars. 9—2(a), (b).[2] An instruction on voluntary manslaughter based upon an unreasonable belief in justification is permissible only if a defendant presents some evidence that unlawful force was used against defendant, and that defendant was not the aggressor. See *People v. Tenner*, 157 Ill. 2d 341, 373 (1993); *People v. Sloan*, 111

---

[2]Effective July 1, 1987, the legislature amended section 9—2 of the Criminal Code of 1961 and replaced the offense of voluntary manslaughter with the offense of second degree murder. 720 ILCS 5/9—2 (West 1994); see *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995). The second degree murder statute incorporated the mitigating factors of sudden and intense passion and unreasonable belief in self-defense.

Ill. 2d 517, 521 (1986). As discussed above, there is no evidence of record that either victim used unlawful force against defendant. The evidence indicates that defendant was the aggressor. Therefore, we find that defendant suffered no prejudice.

We further determine that defendant has failed to make a substantial showing that he suffered prejudice at the guilt-innocence phase of his trial due to the failure of defense counsel to request a jury instruction and verdict for voluntary manslaughter on the basis that at the time of the killing defendant was acting "under a sudden and intense passion resulting from serious provocation." Ill. Rev. Stat. 1981, ch. 38, par. 9—2(a). To constitute "serious provocation," it must be established that the provocation fits within certain recognized categories. The categories of serious provocation which have been recognized by this court are " ' "substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with [defendant's] spouse." ' " *Tenner*, 157 Ill. 2d at 371, quoting *People v. Fausz*, 95 Ill. 2d 535, 539 (1983), quoting *People v. Crews*, 38 Ill. 2d 331, 335 (1967). Neither the evidence of record, nor the facts presented in the affidavits, establish that any of the recognized provocations apply in the case at bar.

In a related argument, defendant contends that, but for the above-described errors on the part of defense counsel during the guilt-innocence phase of the proceedings, defendant would not have been found eligible for the death penalty because his eligibility was based on a statutory provision requiring a finding of intent to kill. Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(3). For the reasons previously stated, we determine that defendant has failed to make a substantial showing that he was prejudiced at the eligibility stage of his trial due to defendant's claims of counsel's ineffectiveness during the guilt-innocence stage of the proceedings.

Defendant next contends that Levin was distracted from defendant's trial due to outside obligations, resulting in Levin rendering ineffective assistance of counsel. According to defendant, the record indicates that Levin was fully occupied with other matters, both before and during defendant's trial, and his inattentiveness to defendant's case explains counsel's lack of preparation, investigation, and strategic planning. In support of this claim, defendant cites to a comment made by Levin in response to the trial court judge's query whether there was any reason that Levin could not proceed with defendant's case immediately after he completed another criminal trial. Levin informed the judge that although he had been trying two criminal cases simultaneously during the prior three weeks, he could think of no reason why he could not immediately start defendant's trial, "save for the burnout factor."

Defendant further contends that Levin's preoccupation with other matters did not cease when defendant's trial commenced. According to defendant, because Levin was absent from the courtroom at many critical stages of the trial, defendant was left "effectively unrepresented." Although Levin's assistant, attorney Steven Decker, was present in the courtroom on the occasions when Levin was absent, defendant contends that Decker's presence cannot excuse Levin's absences. Additionally, defendant notes that Decker had not filed an appearance on defendant's behalf.

The State initially responds that defendant failed to raise this claim on his direct appeal, and thus it is waived. We disagree. The waiver doctrine does not apply where, as here, defendant asserts that the alleged waiver stems from ineffective assistance of appellate counsel. *People v. Winsett*, 153 Ill. 2d 335, 346 (1992). However, we find that defendant has failed to make a substantial showing that he suffered prejudice as a result of Levin's courtroom absences.

We have repeatedly held that when a defendant claims ineffective assistance of counsel based upon allegations that counsel was distracted due to personal and professional circumstances, the defendant must establish that, absent these distractions, there is a reasonable probability that the outcome of defendant's trial would have been different. See *People v. Orange*, 168 Ill. 2d 138, 162 (1995); *People v. Titone*, 151 Ill. 2d 19, 32 (1992). Defendant, citing to a footnote in *United States v. Cronic*, 466 U.S. 648, 659 n.25, 80 L. Ed. 2d 657, 668 n.25, 104 S. Ct. 2039, 2047 n.25 (1984), contends that the prejudice caused by Levin's absences is a "foregone conclusion." Defendant's reliance on *Cronic* is misplaced. The portion of the *Cronic* decision on which defendant relies states: "The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25, 80 L. Ed. 2d at 668 n.25, 104 S. Ct. at 2047 n.25. The record indicates that Levin and Decker were acting in concert as defendant's counsel, and that defendant was never without representation throughout the course of his trial. Aside from defendant's misplaced citation to *Cronic*, defendant offers neither argument nor evidence that he was prejudiced by Levin's absences from the courtroom. Therefore, we reject defendant's claim.

Defendant next argues that his defense counsel improperly admonished him concerning his right to testify. Defense counsel entered into an agreement with the State not to pursue a motion to suppress statements made by defendant to a detective and assistant State's Attorney after his arrest, in exchange for an agreement by the State that it would not use defendant's statements in its case in chief, but would reserve them only for impeachment purposes in rebuttal if defendant testified. According to defendant, counsel told him, in open court,

that this agreement meant that he could not testify in his own behalf. Defendant's claim is waived on two grounds. Defendant failed to present this claim in his original or amended petitions for post-conviction relief. 725 ILCS 5/122—3 (West 1994). This claim is additionally waived because defendant failed to raise it on direct appeal. *People v. Madej*, 177 Ill. 2d 116, 127 (1997).

Defendant next contends that he has made a substantial showing that defense counsel was ineffective because counsel failed to make discovery requests "seeking unrecorded exculpatory witness statements taken by the State." According to defendant, had trial counsel requested these statements, counsel would have discovered the statements that Gregson and Prater contend that they made to the police describing the changes in defendant's behavior shortly before the killings and defendant's fear of the victims. Defendant argues that this favorable evidence would have been material to his case to the extent that it would support a mental state defense as well as provide mitigating evidence.

We find that defendant has failed to make a substantial showing that he was prejudiced by counsel's failure to specifically request unrecorded exculpatory witness statements. We observe that prior to trial, defense counsel filed a comprehensive motion for discovery and inspection, requesting, *inter alia*, "any material or information within its possession or control which tends to reduce *** punishment." The statements of the type defendant now contends should have been turned over were encompassed by the filed motion. However, for the reasons previously stated in this opinion, we do not discern a reasonable probability that the result of defendant's trial would have been different had these alleged unrecorded statements been introduced. As noted above, neither Gregson's nor Prater's observations regarding defendant's behavior at the time of the crimes,

nor Prater's belief that defendant generally feared Motley and Merkson, would have been sufficient to support the alleged mental state defenses.

In a related argument, defendant contends that the State violated defendant's right to due process by withholding the alleged statements made by Gregson and Prater describing defendant's behavior and mental state. Defendant argues that these statements constituted evidence that the State was required to disclose pursuant to *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Defendant argues that, since his trial counsel requested information that would tend to reduce punishment, the State's failure to disclose this evidence is particularly egregious. Defendant contends there is more than a reasonable probability that the exculpatory evidence at issue regarding defendant's mental state would have resulted in a different trial outcome.

We determine that defendant's claim lacks merit. In *Brady*, the United States Supreme Court required disclosure of evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1197. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). As stated above, on this record defendant has failed to make a substantial showing that there is a reasonable probability that the statements made by Gregson and Prater concerning defendant's behavior at the time of the offenses would have affected the outcome at the guilt-innocence phase of defendant's trial. Accordingly, we reject defendant's claim.

Defendant's final contention is that the "cumulative effect" of counsel's failures at trial denied him his

constitutional right to the effective assistance of counsel. However, this claim is waived, as defendant failed to raise it in his amended post-conviction petition. 725 ILCS 5/122—3 (West 1994).

In sum, defendant's allegations fail to make a substantial showing of a violation of his right to effective assistance of counsel at the guilt-innocence phase of trial and at death penalty eligibility. Therefore, the dismissal of that portion of his post-conviction petition without an evidentiary hearing was proper. Accordingly, the judgment of the trial court is affirmed as to these issues.

### Aggravation-Mitigation Phase

Defendant next contends that the post-conviction judge's ruling that defendant was afforded effective assistance of counsel during the aggravation-mitigation portion of his capital sentencing hearing was manifestly erroneous. Defendant contends that his trial counsel was ineffective at the sentencing phase of his trial because counsel failed to investigate and present mitigating evidence of defendant's medical background, specifically, his organic brain damage. According to defendant, had Levin performed even the most minimal investigation, he would have learned of defendant's life-long brain damage, history of seizures, and other neurological impairments from medical records, school records, and defendant's criminal file. In addition, defendant's friends and family could have provided Levin with vivid recollections of defendant's medical problems since childhood. Defendant further asserts that counsel was ineffective because counsel also failed to introduce evidence of defendant's abused and deprived childhood.

In finding that defense counsel's performance during defendant's capital sentencing hearing was not deficient, the post-conviction judge found that Levin "did an adequate job based upon the information he had," which consisted of knowledge of a "prior mental condition."

The judge also found that there was nothing in the record to indicate that counsel "should have investigated further or presented any other evidence" in relation to defendant's possible brain damage. The conclusion of the post-conviction judge that counsel had no notice of this potential mitigating evidence, and that, even if counsel had such notice, counsel had no reason to conduct an investigation, is contrary to both this court's well-established precedent and to the facts presented in this case. We hold that the post-conviction judge's finding that defense counsel satisfied the performance prong of *Strickland* is manifestly erroneous.

This court has repeatedly observed that "[m]itigating evidence is extremely important under the Illinois capital sentencing scheme. Once an aggravating factor is found sufficient to impose the death penalty, there must be mitigating evidence sufficient to preclude the imposition of the death penalty." *People v. Perez*, 148 Ill. 2d 168, 194 (1992). Because of the critical importance of mitigating evidence, it is well established that defense counsel has a duty to make a reasonable investigation for mitigation evidence to present at the capital sentencing hearing, or must have a sound reason for failing to make a particular investigation. See *Strickland*, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066; *Towns*, 182 Ill. 2d at 510; *Orange*, 168 Ill. 2d at 170. Therefore, if mitigating evidence exists, "counsel then has a duty to introduce it in support of defendant." *Towns*, 182 Ill. 2d at 510; see also *Griffin*, 178 Ill. 2d at 86; *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989).

The record in this matter establishes that defense counsel violated his affirmative duty to conduct a reasonable investigation into potential sources of mitigation evidence in connection with defendant's medical condition. Counsel's failure in this regard is magnified by the fact that, contrary to the determination of the post-conviction

judge, the record is replete with evidence that defense counsel was on notice of defendant's history of mental health problems. During the post-conviction evidentiary hearing, defendant's sister, Ruby Roberts, testified that Levin was hired by defendant's mother the same day defendant was arrested, and that the first time Levin was informed of defendant's seizures and related medical problems was shortly after his hiring. According to Roberts, Levin assured her mother that he would "get on it right away." Roberts further testified that she and her mother reminded Levin of defendant's seizures and his need for medical treatment in prison, and that Levin responded that he "was on top of it."

Roberts' testimony that Levin was aware of defendant's medical problems from virtually the beginning of the case is corroborated by Levin's actions during the sentencing phase of defendant's capital trial. During his opening statement at the aggravation-mitigation stage of the sentencing hearing, Levin told the court he would present evidence "regarding medical testimony as to the problems medically that the defendant has had and still suffers from." During the sentencing hearing, Levin also stipulated to the admission into evidence of a 1978 presentence investigation report which noted that defendant suffered continuing seizures after receiving a blow to the head at age eight.

Additional evidence that Levin was on notice of defendant's condition is found in Levin's questioning of defendant's mother, Josephine Rogers, during the mitigation phase of the trial. Levin asked Rogers whether defendant had been hurt as a youngster and if defendant "sometimes do[es] things that he is not responsible for" when he fails to receive medical care or medication. Levin also asked Rogers: "Since eight years old until today's date, has [defendant] had problems as a result of the spot on his brain?" Finally, Levin inquired of defendant's

mother if she was aware that "unless [defendant] takes his medication" defendant has "problems functioning." Levin's knowledge of defendant's medical condition is further confirmed by his statement to the judge during the sentencing hearing after the judge denied counsel a continuance to call other witnesses. Levin conveyed to the judge that defendant wanted the judge to know that defendant was receiving medication and "had prior instances involving a spot on the brain which was supposed to have been traceable to an injury which occurred when he was eight years old."

The evidence adduced during the post-conviction evidentiary hearing further reveals that despite being aware of defendant's mental condition and brain damage, defense counsel failed to conduct an investigation into this relevant potential mitigation evidence. Several of the affidavits submitted by defendant in support of his petition contain statements by the affiants that they were never contacted by defense counsel during trial, and that they would have been willing to provide information and testify in defendant's behalf if asked to do so. Further, the testimony of Ruby Roberts during the post-conviction evidentiary hearing indicates that defense counsel never inquired of her or her mother regarding potential mitigation evidence or witnesses. Importantly, during his testimony at the evidentiary hearing, Levin stated that he could not independently recall defendant's case, and, because the case file was missing, he could not testify as to whether he interviewed witnesses or reviewed any documents in connection with defendant's brain damage.

The record additionally reveals that defense counsel failed to inquire about defendant's family history. The evidence presented during the post-conviction proceedings revealed defendant's abused and violent childhood, and showed that defendant's attorney failed to contact numerous individuals familiar with defendant's back-

ground who were willing to testify on defendant's behalf at sentencing.

The State contends that Levin's representation of defendant did not fall below an objective standard of reasonableness. The State relies upon Levin's testimony during the post-conviction evidentiary hearing that his conversations and contacts with defendant led him to believe that investigation into defendant's mental state was unwarranted. We find that the State's argument lacks merit. As stated, the record clearly establishes that defense counsel was on notice that defendant suffered from medical problems involving his brain damage and mental deficiency. Furthermore, Levin's testimony at the evidentiary hearing was contradictory on its face: after repeatedly stating that he had "no independent recollection" of defendant's case and no case file, Levin then testified in detail concerning various interactions with defendant during his period of representation. For example, after testifying that he had no recollection of defendant or his case, Levin stated that defendant was able to converse with Levin without difficulty, and that during their course of dealings, defendant never blanked out, lost his train of thought, mumbled, appeared impulsive or angry, or suffered seizures.

The State also argues that defense counsel cannot be faulted "in failing to further investigate defendant's mother's vague assertions regarding her son's past seizure activity," because "such vague and general evidence would not have necessarily suggested to Levin, a layman with no evidence of medical training, that he should delve more deeply into defendant's mental health history." We have repeatedly held that the duty to make a reasonable investigation concerning potential mitigation evidence is imposed on counsel and not upon a defendant. *Towns*, 182 Ill. 2d at 511; *Perez*, 148 Ill. 2d at 193. Moreover, we have also held that defense counsel's

duty to investigate is not limited to matters about which defendant has informed defense counsel. *Towns*, 182 Ill. 2d at 511. We therefore reject the State's implication, under the facts of this case, that defense counsel's duty to investigate potential mitigation evidence is somehow lessened by the lack of the specificity of information conveyed by members of defendant's family.

The State further contends that because Levin was faced with a lack of mitigation evidence, he adopted a strategy of pleading for the judge's mercy at the sentencing hearing. According to the State, Levin's "strategic choice" did not amount to incompetence. The State's argument is without merit. We are mindful that great deference is accorded to a trial counsel's strategic decisions regarding the presentation of mitigating evidence. *People v. Steidl*, 177 Ill. 2d 239, 257 (1997); *Orange*, 168 Ill. 2d at 170. It is well established, however, that such deference is not warranted where, as in the instant matter, the lack of mitigation evidence stems from counsel's failure to properly investigate and prepare a defense. *Towns*, 182 Ill. 2d at 514; *Steidl*, 177 Ill. 2d at 257; *Orange*, 168 Ill. 2d at 170. There can be no legitimate "strategy" where counsel has failed to make any investigation into mitigating circumstances. *People v. Ruiz*, 177 Ill. 2d 368, 385 (1997); *People v. Coleman*, 168 Ill. 2d 509, 535-36 (1995); see also *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995); *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995). The evidence shows that counsel totally failed to investigate or present evidence of defendant's medical history or social background from readily available sources. Therefore, we hold that counsel's failure to investigate was not a strategic choice among available options.

This court has previously held that defense counsel's failure to investigate and present evidence of a defen-

dant's mental health, neuropsychological difficulties, and social background constituted deficient performance which satisfies the first prong of *Strickland*. In *People v. Perez*, 148 Ill. 2d 168 (1992), this court determined that defense counsel rendered ineffective assistance of counsel during the defendant's capital sentencing hearing in failing to investigate and present evidence of the defendant's mental history and background. Evidence adduced during the post-conviction evidentiary hearing established that at the time of the defendant's sentencing hearing, defense counsel had in his possession the defendant's school records, which revealed that the defendant was mentally deficient and had been placed in special classes for the mentally handicapped. Defense counsel, however, failed to present this evidence to the sentencing jury. This court concluded that the defense attorney was unaware of the contents of the school reports at the time of the sentencing hearing due to his "lack of diligence," which consequently prevented counsel from investigating and presenting important mitigating evidence contained in the records. *Perez*, 148 Ill. 2d at 189.

In *Perez*, this court noted that although counsel stated that he had been provided no information about the defendant to investigate, defendant's school records contained family information such as the names, addresses and telephone numbers of the defendant's relatives, as well as the names of the defendant's schools, his teachers' initials, and the names of the qualified school psychologists who prepared the reports. In finding that the actions of defense counsel fell below an objective standard of reasonableness, this court concluded that counsel's "failure to investigate was the result of ignorance of the family information contained in the various records he possessed." *Perez*, 148 Ill. 2d at 192.

Levin's total failure to conduct any investigation in the case at bar falls below even the minimal efforts of

defense counsel found to be deficient in *Perez*. Defense counsel in *Perez* had obtained Perez's school records. Levin obtained no records or documents concerning defendant's medical history or social background, and conducted no investigation of potential mitigation evidence, even though he was patently aware of the severe medical problems involving defendant's brain and defendant's mental limitations. Levin's failure to conduct an investigation into potential mitigation evidence is magnified by the fact that defendant's mother and sister were almost always present in the courtroom, and were willing and able to assist.

Similarly, in *People v. Ruiz*, 177 Ill. 2d 368 (1997), this court found defense counsel's performance during the defendant's capital sentencing hearing to be below minimal professional standards. In *Ruiz*, evidence introduced during the post-conviction evidentiary hearing showed that defense counsel never inquired into the defendant's family background, school records, drug and alcohol usage, or about individuals who might have been able to supply information about him. Also, an evaluation by a clinical psychologist revealed that the defendant had cognitive dysfunction, dysfunction in the left central hemisphere of the brain, diffuse misfunction of the frontal lobe, and several other problems "peppered throughout the brain." The expert in the *Ruiz* case testified that the defendant's neuropsychological dysfunctions could have contributed to his participation in a violent triple murder. We determined in *Ruiz* that counsel's failure to investigate and present this mitigation evidence was attributable to neglect rather than strategy. *Ruiz*, 177 Ill. 2d at 385-86.

Defense counsel in *Ruiz* showed the same deficiencies demonstrated by Levin in the instant matter. In both cases, defense counsel failed to undertake any meaningful investigation of defendant's background and charac-

·ter, did not obtain the assistance of anyone to investigate potential mitigation issues, failed to introduce documentary evidence in mitigation such as school or medical records, and did not obtain evaluations by experts to analyze and interpret potential mitigating evidence.

We conclude that Levin's failure to investigate and present mitigating evidence, which would have readily been revealed by a thorough investigation of defendant's medical history and social background, constituted representation which fell below objective standards of reasonableness under prevailing professional norms. Therefore, defendant has satisfied the first prong of *Strickland.*

We now determine whether the second prong of the *Strickland* analysis is met, that is, whether Levin's deficient performance so prejudiced defendant as to deny him a fair sentencing hearing. We conclude that it did.

Assessing the potential prejudice of an asserted deficiency in counsel's performance at a capital sentencing hearing requires that we examine the effect of counsel's conduct upon the sentencer's decision. *Tenner,* 175 Ill. 2d at 384; *People v. Sanchez,* 169 Ill. 2d 472, 490-91 (1996). The relevant question is "whether there is a reasonable probability that, absent the errors, the sentencer \*\*\* would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069. "Moreover, we must assess prejudice in a realistic manner based on the totality of the evidence. Accordingly, it is improper to focus solely on the potential mitigating evidence. As our cases illustrate, the nature and extent of the evidence in aggravation must also be considered." *Coleman,* 168 Ill. 2d at 538.

Defendant contends that Levin's failure to investigate defendant's organic brain damage and social background prejudiced him at sentencing, because there is a reasonable probability that presentation of this evidence in mit-

igation would have avoided a sentence of death. Defendant contends that prejudice is particularly apparent in the instant matter, where the absent mitigating evidence helps explain not only the aggravating evidence presented by the State at defendant's capital sentencing hearing, but also defendant's actions at the time of the homicides.

We agree. A review of the comments made by the trial court judge at the time defendant's death sentence was imposed reveals that the judge was clearly influenced in his sentencing decision by the lack of evidence in mitigation. In sentencing defendant to death, the trial court judge stated that he had considered defendant's background, which was "one of all criminal conduct." The judge explicitly stated that the only mitigation evidence presented on defendant's behalf was Rosemary Thomas' testimony that she lived with defendant for many years and that he treated her and the children well. Because Levin had failed to investigate and present readily available mitigation evidence, the judge was unaware not only of defendant's severe life-long brain damage and neurological impairments, but also of defendant's abused childhood. This evidence would have provided the court with a portrait of defendant that may have influenced the choice of sentence.

Concerning the circumstances of the crime, the judge commented that "there wasn't any rhyme, there wasn't any reason" to the "senseless killings." We determine that there is a reasonable probability that Levin's failure to present any evidence of defendant's brain damage, seizures and neurological impairments deprived the judge of the "rhyme" and "reason" for which he was searching to explain defendant's behavior in this crime.

Finally, the trial court judge noted that although imposing the death penalty was "very distasteful," he nevertheless had "a job to do." Under the Illinois death penalty statute, if no sufficient mitigation factors are

found, "the court *shall* sentence the defendant to death." (Emphasis added.) 720 ILCS 5/9—1(h) (West 1994). In the case at bar, because no evidence was presented in mitigation, the trial court judge believed he was required to impose the death sentence.

We cannot say that the absent mitigation evidence could not have altered the judge's decision that there was no evidence that militated against imposition of the death sentence. The comments of the sentencing judge reveal a nexus between his imposition of the death penalty and defense counsel's failure to present any mitigating evidence other than two unprepared family character witnesses, whose testimony accounted for only 10 pages of trial transcript.

The State nevertheless contends that the record establishes that defendant was not prejudiced by any actions on the part of Levin. Initially, the State discounts the significance of the evidence concerning defendant's brain damage on the basis that defendant's medical experts did not find him to be significantly below average in intelligence. However, defendant's experts stated that a person can have a relatively normal IQ, yet still suffer damage to the frontal lobes of the brain. We note that during the post-conviction evidentiary hearing, the State introduced no expert testimony to refute the conclusions of defendant's experts.

The State argues that counsel's failure to present evidence of defendant's brain damage did not prejudice defendant, because much of the mitigating evidence that counsel might have introduced could have been characterized or viewed as evidence in aggravation. This court has held that evidence concerning a defendant's mental or psychological impairment is not inherently mitigating. *Sanchez*, 169 Ill. 2d at 491-92.

The State argues that the evidence introduced concerning defendant's alleged brain damage during the

post-conviction proceedings was replete with factors in aggravation. The State points to Dr. Pincus' conclusion in his affidavit that defendant's brain damage resulted in "aggressive and violent behavior," and that defendant's "aggressive impulses" have been engendered by abuse. The State cites to Dr. Rybicki's affidavit, wherein he noted that the manner in which defendant responded to certain neurological testing has been known to correlate with "hostile impulses" and "emotional outbursts." The State also relies upon Dr. Rybicki's statement during the evidentiary hearing that defendant's exposure to violence "taught him that violence is sometimes an acceptable solution to problems." The State additionally notes that the affidavits submitted by defendant's family and friends include aggravating information. For example, one affiant stated that he saw defendant "become violent for no reason at all," and another stated that "[o]ne time when you would see [defendant] he would be fine and the next time hostile and paranoid." The State contends that this evidence is even more aggravating when viewed in light of defendant's criminal history and the heinous and brutal manner in which the homicides of Merkson and Motley were conducted.

The State additionally argues that because the aggravation evidence in the cause at bar was "overwhelming," it cannot be said that but for counsel's failure to investigate and present mitigation evidence, the judge would have concluded that the balance of aggravating and mitigating factors did not warrant the death penalty.

Under Illinois' death penalty statute, the finder of fact is required to weigh the aggravating and mitigating evidence, and to determine whether there are "mitigating factors sufficient to preclude the imposition of the death sentence." 720 ILCS 5/9—1(g), (h) (West 1994). Previous decisions demonstrate that the presence of aggravating evidence does not foreclose the conclusion that

a defendant was prejudiced by defense counsel's failure to investigate and present available mitigating evidence. *E.g.*, *Ruiz*, 177 Ill. 2d at 379-80 (defendant, a gang member and drug user, shot someone other than the three murder victims, and fired a rifle into a crowded parking lot); *People v. Caballero*, 126 Ill. 2d 248, 279 (1989) (defendant was convicted of three brutal murders, had a past conviction for possession of a gun, and showed no remorse); *Hall*, 106 F.3d at 748 (sentencing judge commented that he was "[f]aced with 'all the aggravating factors *** stacked against the defendant' "); *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (defendant had a "continuous record of truancy and criminality from early youth").

We agree with the State that the heinous nature of the multiple murders for which defendant was convicted is an aggravating factor. Nevertheless, we conclude that the evidence regarding defendant's severe organic brain damage may have provided the court with knowledge of defendant which would have influenced the sentence imposed. This court has previously acknowledged "the critical importance" of evidence of a capital defendant's "mental or emotional problems." *Ruiz*, 177 Ill. 2d at 388. To this end, this court has held that the "resulting prejudice to defendant is clear" when counsel fails to investigate a defendant's mental history and background (*Perez*, 148 Ill. 2d at 194-95), especially where "a great deal of mitigating evidence existed which counsel failed to investigate and introduce" (*Ruiz*, 177 Ill. 2d at 387). The prejudice suffered due to defense counsel's failure to investigate and present mitigating evidence is magnified where, as in the instant matter, the record indicates that the sentencing judge was clearly influenced by the failure to present evidence in mitigation on defendant's behalf.

During the post-conviction evidentiary hearing, Dr. Pincus testified that, based upon his personal examina-

tion of defendant, his review of defendant's medical and school records, and his study of defendant's social history, defendant has had severe organic brain damage since infancy. Dr. Pincus testified that defendant suffers from severe bilateral dysfunction of the frontal lobes of the brain, as well as from more diffused damage to other portions of his brain. Dr. Pincus testified that as a result of frontal lobe damage, a person has "extremely poor judgment," suffers changes in personality and behavior, and cannot understand the consequence of his actions. Importantly, Dr. Pincus testified that the physical damage to defendant's frontal lobes causes defendant to be "short tempered" and "unable to check his impulses," and that there is a direct connection between the damage to defendant's brain and the conduct described as part of the State's case in aggravation during the death penalty hearing. For example, in connection with defendant's battery of Joseph Smoot, Dr. Pincus testified that defendant's brain damage caused defendant to have a "paranoid thought" concerning Smoot, and because of the damage to his brain, defendant was unable to check his "impulsive, irrational" behavior.

Significantly, Dr. Pincus also testified that defendant's brain damage was the "determining factor" in his behavior at the time of the murders of Motley and Merkson. Dr. Pincus testified that the manner in which the offenses were carried out was characteristic of defendant's frontal lobe damage, revealing "stimulus-bound" behavior and "excessive paranoia." Dr. Pincus stated that, because of the damage to defendant's brain, defendant misinterpreted Motley's telephone calls as posing a danger, even though Motley was defendant's longtime friend and did nothing threatening concerning defendant. Dr. Pincus testified that, when Motley commented in connection with defendant's instruction to Gregson to dance without her clothes, because of defendant's brain

damage, he "over responded" to that comment and shot Motley. The effect of defendant's brain damage was also evident in what Dr. Pincus described as defendant's "absurd" cleaning up of Motley's body by attempting to fit it into a dresser drawer. Dr. Pincus also testified that defendant's stimulus-bound behavior caused defendant to shoot Merkson when Merkson refused to stop joking. In addition, Dr. Pincus testified that defendant's brain damage affected his actions in connection with Gregson, as there was no clear purpose in placing her in the bathroom, taking her to the motel, and chasing the motel attendant. Dr. Pincus concluded that defendant would not have conducted himself the way he did at the time of the offenses had the frontal lobes of his brain not been damaged.

Dr. Rybicki also diagnosed defendant with extreme impairments to the frontal lobes of his brain, and testified that these impairments were caused by encephalitis at the age of 20 months. Dr. Rybicki testified that defendant's physical brain damage is so severe that 98% of the general population has a brain which is more intact than defendant's. According to Dr. Rybicki, defendant's brain damage causes him to suffer from "paranoid ideation," which impairs his social judgment and his ability to think in logical sequences. Dr. Rybicki testified that because of his brain damage, at the time of the offenses defendant's paranoia caused him to "misconstrue" the actions of Motley and Merkson and to react in an "irrational" manner.

We find that the testimony of Dr. Pincus and Dr. Rybicki concerning defendant's severe organic brain damage explains defendant's violent conduct as related in the State's case in aggravation, as well as defendant's conduct at the time of the homicides. Both experts testified that there was a definite link between the physical damage to defendant's brain and defendant's criminal

conduct. The State adduced no expert medical testimony during the post-conviction evidentiary hearing. In the absence of any countervailing evidence from the State, the conclusions of defendant's experts stand unrefuted. We determine that there is a reasonable probability that the impact of the aggravating evidence presented by the State could have been diminished by evidence of the effect upon defendant's conduct caused by defendant's brain deficits and impairment.

In addition, evidence of a defendant's background, including family history, parental abuse, and neglect is important to the sentencing decision and can be an influential mitigating factor. *Towns*, 182 Ill. 2d at 519; *Ruiz*, 177 Ill. 2d at 388; *Coleman*, 168 Ill. 2d at 537; *Perez*, 148 Ill. 2d at 194-95. In the case at bar, the evidence of defendant's abused upbringing, testified to in great detail by Ruby Roberts, would have provided the trial court judge with a better knowledge and understanding of defendant's conduct.

Further, defendant may have been prejudiced by defense counsel's failure to present medical evidence relating to defendant's brain damage, as counsel indicated he would do at the time he presented his opening argument at the aggravation-mitigation phase of the sentencing proceedings. The record reveals that the *only* testimony during the entire trial referring to defendant's severe brain impairment was the comment made by defendant's mother that defendant has "a spot on his brains" and that if he does not take his medication, he has "these seizures, and he's a complete blank *** he don't know what he's doing."

Counsel's closing argument at the aggravation-mitigation phase of the sentencing proceedings compounded the prejudice. Counsel's argument consisted of irrelevant and incoherent religious references and nonsensical pleas, with no effort to focus on any mitigat-

ing evidence. For example, counsel began by stating: "If human beings, such as yourself, feel it appropriate to rectify the wrong and [mete] out a punishment, which is an eventuality of punishment, which is meted out by somebody else who is far more knowledgeable than you or I, who is the person who decides. The giver of life then—then I would suggest that this court has taken a step towards immortality which should not be done."

Apparently responding to the State's assertion in its closing argument that the defense had failed to present any evidence in mitigation on defendant's behalf, Levin argued that "when somebody has suggested that there is no mitigation, there is no right, that there is no love, they're wrong. Mothers love their children. Wives love their husbands. Fathers love their children. But love is espoused by somebody much bigger than somebody who is not here today." In what appears to be an attempt to explain the lack of mitigation evidence presented on behalf of defendant, Levin concluded that "[m]itigation many times is not something that can be directly spelled out by the mouth, by the words. Mitigation is not something which individuals come before this Court and say, I apologize, I forgive, I have sinned. Mitigation is the process of individuals. Mitigation is the love that is shown by individuals. Mitigation, in fact, Judge, is the being of human beings."

At no point in his closing argument at the aggravation-mitigation stage of the proceedings did counsel mention the severe physical damage to defendant's brain or the impact that damage had upon defendant's behavior. Had counsel fulfilled his duty to investigate the wealth of mitigation evidence available in this case, he would have discovered the severe extent of defendant's brain damage and the profound effect that damage had on defendant's ability to control his conduct. Defense counsel would also have discovered the extent of

the abuse defendant suffered throughout his childhood, as well as defendant's learning disabilities. Counsel's failure to investigate mitigation evidence, coupled with counsel's nonsensical closing argument, left the court with a prejudicial imbalance in the court's determination that there were no factors in mitigation to preclude the imposition of the death penalty.

We note that, in previous decisions, this court has addressed post-conviction claims alleging ineffective assistance of counsel at the capital sentencing hearing, and has held that, despite the violent nature of the offenses and the fact that the defendants had been convicted of multiple murders, the failure of defense counsel to present and investigate mitigating evidence so prejudiced the defendants as to warrant vacating their death sentences and ordering new sentencing hearings. We find those cases to be instructive here. See *Ruiz*, 177 Ill. 2d at 388-89; *Perez*, 148 Ill. 2d at 195-96.

The ultimate focus of a claim of ineffective assistance of counsel must be upon the fundamental fairness of the proceedings challenged. *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. The court must scrutinize and remain vigilant in determining whether the proceedings are unreliable because of a breakdown in the adversarial process. *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. We conclude that such a breakdown occurred in this case, and that the errors of defense counsel during the aggravation-mitigation phase of the sentencing proceedings raise a serious doubt as to the propriety of defendant's sentence. We therefore affirm defendant's convictions but vacate his death sentence and remand this cause to the circuit court for a new sentencing hearing. As a consequence, we find it unnecessary to address the remainder of defendant's claims.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*

558

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that we should vacate defendant's death sentence. In my view, however, there is no need to remand the cause to the circuit court for resentencing. Under the circumstances of this case, the only function a new sentencing hearing would serve is to permit the State to seek the death penalty again. That should not be an option. For the reasons set forth in my dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Defendant must therefore receive a sentence of imprisonment. Because defendant has been found guilty of murdering more than one victim, the term of his imprisonment must be natural life. Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1)(c).

JUSTICE BILANDIC, dissenting:

I do not agree with the majority that defendant is entitled to a new sentencing hearing. The post-conviction trial court determined that, given "the viciousness of the crime" and "defendant's long criminal history," there was no reasonable probability that the outcome of defendant's sentencing hearing would have been different had counsel presented the mitigating evidence at issue. The trial court's determination is not manifestly erroneous. Therefore, I respectfully dissent.

There is no reasonable probability that, had counsel presented the mitigating evidence at sentencing, the trial court would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. See *Strickland v. Washington*, 466 U.S. 668, 695, 80 L.

Ed. 2d 674, 698, 104 S. Ct. 2052, 2069 (1984). Defendant's sentencing hearing was replete with aggravating evidence. The State introduced defendant's extensive criminal history. Defendant was convicted of armed robbery in 1965. While on probation for that armed robbery, defendant committed aggravated battery by attacking a man who was playing softball at a park by hitting the man on the back of the head with a baseball bat. A few years later, defendant was convicted of aggravated battery, intimidation, and mob action after organizing a race riot in Cook County jail, where he was incarcerated. This riot occurred when defendant and another inmate armed themselves with sticks and buckets of scalding hot water and ordered all white inmates to get down on their knees. Defendant told the white inmates that he was going to hang them. On another occasion, defendant was charged with aggravated battery and unlawful use of a weapon after shooting two females with a sawed-off shotgun. At the time of defendant's sentencing hearing in this case, yet another case was pending against defendant involving charges of possession of a controlled substance, possession with intent to deliver, and battery.

Moreover, the facts of this case show that defendant is a domineering and remorseless murderer who knew exactly what he was doing as he committed these crimes. Defendant, William Motley, and Kenneth Merkson visited defendant's friend of 12 years, Elijah Prater, at Prater's apartment. Prater's girlfriend, Phyllis Gregson, subsequently arrived at the apartment. Defendant told Gregson to remove her shirt and dance. Gregson refused. At this point, Motley made a comment. In response, defendant aimed his shotgun at Motley's chest and fired, causing the left side of Motley's chest to be blown away. Defendant removed Motley's .357 Magnum gun from his dead body and told Prater and Merkson to "clean up the body." Merkson removed a black telephone book from

Motley's clothes and gave it to defendant. Defendant looked at the names in the book, asked if anyone knew any of the listed individuals, and then placed the book in his pocket.

Defendant told Prater and Merkson to pull the drawers out of a dresser to determine whether the dead body would fit inside it. Because the body was too large, Prater and Merkson stuffed it into a laundry bag, pulled a mattress out of the closet, and wrapped the mattress around the body. Defendant ordered Gregson to clean the blood off the floor. Approximately one hour later, defendant sent Prater to the liquor store and told Prater to fill up defendant's car with gas and park it at the rear of the apartment building.

When Prater returned, defendant was sitting in the dining room with the shotgun in his lap and the .357 Magnum in the waistband of his pants. Merkson was walking around the apartment making jokes. Defendant told Merkson to stop making jokes and to get Motley's body out of the apartment. As Merkson and Prater were moving Motley's body, Merkson made another "crack." Defendant chased Merkson into the front room of the apartment, repeatedly hit Merkson in the head with the .357 Magnum, and then said, "Now let's get the body out of here." When Merkson made another comment, defendant told him to get down on his knees and face the floor. Merkson got down on his knees, and defendant pointed the .357 Magnum at Merkson's head and shot him. Defendant then said to Prater, "It's just us now and you got to get up the body." As Prater began to tie up Merkson's body, defendant began shooting at Prater. Prater escaped as defendant continued to shoot at him.

In the meantime, defendant had ordered Gregson into the bathroom. After shooting at Prater, defendant ordered Gregson to come out of the bathroom. When Gregson opened the door, defendant grabbed her arm

and said, "You're going with me." Defendant and Gregson drove to a motel, where defendant checked into the motel under an alias. Once inside the motel room, defendant raped Gregson. After the rape, defendant said that he was hungry and "let's go get something to eat." As defendant and Gregson were walking to defendant's car, a motel employee observed defendant holding a gun to Gregson's head. When defendant saw the employee, he aimed his gun at the employee and began to chase him. As the employee ran toward the motel lobby, defendant stopped chasing him and took Gregson by the arm and pushed her into his car. Defendant later released Gregson and warned her that he would find her if she told anyone about the crimes. Defendant was arrested the next day after Prater contacted the police.

The senseless and heartless nature of defendant's crimes reveals a cold-blooded murderer who attempted to conceal his crimes by killing or threatening all witnesses. Given the extent of the aggravating evidence in this case, there is no reasonable likelihood that the result of defendant's sentencing hearing would have been different had the trial court heard the evidence that was revealed during the post-conviction proceedings.

This court has, on numerous occasions, rejected defendants' claims that they were prejudiced by their attorneys' failure to present certain mitigating evidence at the defendants' capital sentencing hearings, where the aggravating evidence was overwhelming. See, *e.g.*, *People v. Evans*, 186 Ill. 2d 83, 102 (1999) (affirming trial court's dismissal of post-conviction petition without evidentiary hearing); *People v. Johnson*, 183 Ill. 2d 176, 205 (1998) (affirming trial court's dismissal of post-conviction petition without evidentiary hearing); *People v. Coleman*, 183 Ill. 2d 366, 406-07 (1998) (affirming in relevant part trial court's dismissal of post-conviction petition without evidentiary hearing); *People v. Mahaffey*, 165 Ill. 2d 445,

466 (1995) (affirming trial court's dismissal of post-conviction petition without evidentiary hearing); *People v. Caballero*, 152 Ill. 2d 347, 366-67 (1992) (affirming trial court's denial of post-conviction petition following evidentiary hearing); *People v. Jones*, 144 Ill. 2d 242, 278-80 (1991) (affirming trial court's denial of post-conviction petition following evidentiary hearing).

In *People v. Coleman*, 183 Ill. 2d 366 (1998), for example, the defendant's post-conviction petition contained an evaluation from a clinical psychologist which stated that as a result of the defendant's abusive background and early use of drugs, the defendant has low average intelligence, suffers from extreme emotional disturbance, and is prone to impulsive behavior. The aggravating evidence, however, established that the defendant methodically planned an armed robbery of a drug house and shot one of the victims as she was begging the defendant for her life; that the defendant had a long history of violent criminal behavior; and that the defendant's statements to others about the murders at issue revealed a "chilling" lack of remorse for these crimes. This court held that this aggravating evidence outweighed the mitigating evidence presented in the post-conviction petition. *Coleman*, 183 Ill. 2d at 401-02, 405-06.

Similarly, in *People v. Johnson*, 183 Ill. 2d 176 (1998), the defendant's post-conviction petition contained evidence regarding the defendant's dysfunctional family life, as well as an evaluation from a psychologist which stated that the defendant suffered from mild mental retardation and a schizotypal personality disorder. Nevertheless, this court found that the defendant failed to show the requisite prejudice under *Strickland*. The aggravating evidence established that the defendant planned and directed the armed robbery of three people in a private home. During the robbery, the defendant

taunted the victims while they were bound and gagged. The defendant then savagely stabbed to death one of the victims, laughing as he did so. The defendant shot one of the victims as the victim escaped. The evidence also revealed that the defendant had a long history of criminal behavior. *Johnson*, 183 Ill. 2d at 201-08.

Likewise, here, the aggravating evidence far outweighs the mitigating evidence. Given defendant's extensive criminal history, as well as the heinous nature of the crimes in this case, defendant has failed to establish the requisite prejudice under *Strickland*.

As a final matter, I stress the procedural posture of this case. The question presented in this appeal is *not* whether defendant is entitled to an evidentiary hearing on the allegations contained in his post-conviction petition. In such a circumstance, a court must accept the well-pleaded facts in the petition and any accompanying affidavits as true, to determine whether those allegations make a substantial showing that the defendant's constitutional rights have been violated. *People v. Towns*, 182 Ill. 2d 491, 503 (1998). This is, in effect, a preliminary stage to determine whether the defendant is entitled to an evidentiary hearing.

Here, however, the trial court has already held an evidentiary hearing on defendant's allegation that his trial counsel was ineffective for failing to present mitigating evidence at defendant's capital sentencing hearing. After hearing all of the evidence at the hearing, the trial judge denied defendant's post-conviction petition. A trial court's determination following a post-conviction evidentiary hearing will not be disturbed unless the determination is manifestly erroneous. *Coleman*, 183 Ill. 2d at 385. The term "manifest error" means error which is "clearly evident, plain, and indisputable." See *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997). Considering the overwhelming aggravating circumstances in this case, I simply cannot

agree with the majority that the trial court was "evidently, plainly, and indisputably" wrong in denying defendant's post-conviction claim. I agree with the trial court that there is no reasonable probability that the outcome of defendant's sentencing hearing would have been different had the mitigating evidence at issue been presented.

JUSTICE HEIPLE joins in this dissent.