2022 IL App (1st) 121321-U
No. 1-12-1321

FIRST DIVISION
September 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 91 CR 22460 |
| | ) | |
| GEORGE ANDERSON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Matthew E. Coghlan, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Walker concur in the judgment.

**ORDER**

¶ 1    *Held:* We reverse the denial of defendant's motion for leave to file a successive postconviction petition, finding that defendant presented a colorable claim of actual innocence and that he established cause and prejudice for his claim that the prosecution committed a discovery violation pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). We remand this case for further proceedings.

¶ 2    Defendant appeals the trial court's denial of his motion for leave to file a successive postconviction petition filed under the Post-Conviction Hearing Act (Act). 725 ILCS 5/122-1 *et seq.* (West 2018), arguing that he alleged the requisite colorable claim of actual innocence, and

that the State failed to disclose police records pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). For the following reasons, we reverse the trial court's order and remand for further proceedings on the successive petition.

¶ 3                                    BACKGROUND

¶ 4     Defendant George Anderson and his two codefendants, Jerome Johnson (codefendant Johnson)[1] and Michael Sutton (codefendant Sutton), were charged with six counts of first degree murder in the shooting death of Jeremiah Miggins, along with two counts of attempt first degree murder in the shootings of Anthony Wilson and Steven Crosby. Codefendants Michael Sutton (codefendant Sutton) and Jerome Johnson (codefendant Johnson) were determined to be the principal offenders and convicted in separate trials on charges related to the shooting. Defendant elected to proceed with a bench trial before the Honorable Joseph Urso. The trial court found defendant guilty, based on the theory of accountability, of one count of first degree murder and two counts of attempt first degree murder, and subsequently sentenced him to a term of life imprisonment for first degree murder and consecutive terms of 25 years imprisonment for the two attempt first degree murder convictions.

¶ 5                                    **A. Trial**

¶ 6     In the afternoon of August 21, 1991, two members of the C/Notes street gang, Anthony Wilson (Wilson) and Steven Crosby, suffered gunshot wounds when they were shot while in or near a

---

[1] In a separate case, 91 CR 22152, defendant and codefendant Johnson were also charged with, and pled guilty to, first degree murder in the June 9, 1991, shooting death of 14-year-old Kathryn Miles, along with several counts of attempt first degree murder. Defendant was sentenced to 40 years in the Illinois Department of Corrections for first degree murder and a consecutive sentence of 20 years' imprisonment for attempt first degree murder. Codefendant Johnson subsequently filed a motion for leave to file a successive postconviction petition, asserting police coercion and abuse while taking his confession. This court subsequently upheld the trial court's denial of leave to file his successive postconviction petition. *People v. Johnson*, 2021 IL App (1st) 152310.

gangway in the area of 66th and Marshfield. Moments later, 11-year-old Jeremiah Miggins was shot and killed in the yard at 6533 South Marshfield. Prior to the shooting, two members of the Gangster Disciples, defendant and Jerome Johnson (codefendant Johnson), went to that area in order to retrieve codefendant Johnson's car upon learning that the car had been stolen by Lamont Jones (Jones) and Jermaine Crosby, both members of the C\Notes. At that time, the Gangster Disciples and C/Notes street gangs were rival gangs and were active in that area of Chicago. Several members of these warring gangs were arrested and charged with the Jeremiah Miggins' shooting death, as well as the attempt first degree murder of Wilson and Steven Crosby.

¶ 7     The State proceeded to trial under the theory that defendant, as the driver, was accountable for the actions of codefendant Johnson, as well as codefendant Sutton, during the shooting between these rival gang members. Defendant argued at trial that he was not accountable where he merely drove codefendant Johnson to that area to retrieve codefendant Johnson's car, that he did not know that codefendant Johnson was going to use the .22 caliber pistol in his possession, and alternatively, that codefendant Johnson was acting in self-defense where this shooting was initiated by codefendant Sutton, and not codefendant Johnson.

¶ 8                              **Anthony Wilson' Testimony**

¶ 9     At the time of trial, Anthony Wilson had previously pled guilty to first degree murder of Jeremiah Miggins in juvenile court. Wilson testified that on the afternoon of August 21, 1991, he was on the corner of 66th Street and Marshfield with Steven Crosby. Wilson saw two fellow C/Note gang members - his cousin, Jermaine Crosby, and Lamont Jones - drive up in a blue Oldsmobile Delta 88 (Johnson's 88). Wilson had previously seen defendant drive this car, but he did not know that this car had previously been taken from Eric Clark. The four of them had a conversation and then Jermaine went to a nearby pay phone. Afterwards, codefendant Sutton arrived and then

Jermaine, Lamont, and codefendant Sutton left in codefendant Johnson's 88. Wilson knew that this car did not belong to any of these people. Later, these three males returned to this area in that same car, and codefendant Sutton placed a brown paper bag, containing one gun, inside a flowerpot at 66th and Marshfield. Codefendant Sutton said that he was "going to get [defendant] and [Johnson] if they came around the neighborhood, he was going to shoot them…"

¶ 10    Around 1:00 p.m., Wilson and Steven Crosby were standing at this same street corner when Wilson saw a peach-colored Chevy (Meecie's Chevy) exiting the alley at 66th Street, between Marshfield and Paulina. This car then "turned back and went straight down the alley[.]" Defendant was driving Meecie's Chevy, and codefendant Johnson was in the passenger seat.

¶ 11    Wilson testified that he and Steven Crosby walked through a gangway towards the alley. When they were in the gangway, codefendant Johnson exited Meecie's Chevy and started shooting at Wilson and Steven Crosby. At this point, neither codefendants Sutton or Wilson had shot at defendant or codefendant Johnson, and Wilson denied that either of them had a gun. As they exited the gangway, he heard Steven Crosby yell that he had been shot.

¶ 12    Wilson ran to the flowerpot where codefendant Sutton had placed a paper bag, and Wilson picked up a gun that was inside the paper bag. Wilson did not have a gun in his possession prior to this moment and, as far as he knew, Steven Crosby did not have a gun in his possession. The only gun he saw was the one that codefendant Sutton had placed in the flowerpot. At that moment, the gun was shot out of Wilson's right hand. He saw that codefendant Johnson was shooting at him.

¶ 13    Wilson testified that he then saw codefendant Sutton pick up that gun, a .38 caliber, face northward towards 65th Street, and start firing shots at defendant and codefendant Johnson, who

were inside Meecie's Chevy going eastward on 66th Street, towards Ashland Avenue. Wilson did not see any more gunshots coming from the direction of Meecie's Chevy.

¶ 14    Afterwards, Wilson and Steven Crosby ran to a house at 6625 South Marshfield. Codefendant Sutton arrived and said that "he had just got through popping at the marks…" While being treated at the hospital he spoke with some detectives, but he did not tell them the truth because he did not want anyone to get into trouble. He did not tell the police that he had run down the gangway, that he had picked up the gun, or that codefendant Sutton had fired the gun down the street that killed Jeremiah Miggins. Two days later, he went to the police station, accompanied by his father, told officers and an assistant state's attorney what happened and provided a handwritten statement.

¶ 15                    **Steven Crosby's Testimony and Handwritten Statement**

¶ 16    Steven Crosby testified that he was on the corner of 66th and Marshfield with Wilson, codefendant Sutton, and another friend, named Tamu Brooks, when he saw defendant driving and codefendant Johnson the front passenger in Meecie's Chevy that exited the alley between Marshfield and Paulina. Regarding the shooting, he only recalled that he went into a gangway and stumbled when he was shot in the left leg.

¶ 17    However, his handwritten statement was introduced, via stipulation, and stated, in pertinent part, that, while standing around 66th and Marshfield, he saw codefendant Sutton go over to a flowerpot next to a nearby building, bend down, and reach towards the flowerpot. When he, codefendant Sutton, and Anthony Wilson first saw Meecie's Chevy in the alley, they ran to the gangway. He saw codefendant Johnson standing at the other end of the gangway holding a gun. Codefendant Johnson aimed the gun at them and fired it three or four times. Codefendant Sutton and Anthony Wilson were the first to exit the gangway and Steven Crosby "hobbled" out of the gangway. At that point, he saw Anthony Wilson holding a black gun, but codefendant Sutton took

the gun from Wilson, and Wilson "began hollering." Wilson had been shot in the hand and ran southbound to a relative's house on Marshfield. As he began running, codefendant Sutton ran past him and, in front of 6623 South Marshfield, fired two or three times at Meecie's Chevy located along 65th Street. Codefendant Sutton used the gun that he took from Wilson.

¶ 18                                    **Milton Burton's Testimony**

¶ 19        Milton Burton, who lived at 1622 West 66th Street, was sitting by his kitchen window when he saw Meecie's Chevy exit the alley between Marshfield and Paulina and pull into the middle of 66th and Marshfield. The car stopped in the intersection and then reversed back into the alley. He saw a young man exit at the alley and jump into Meecie's Chevy. When Meecie's Chevy pulled back into the middle of 66th and Marshfield, shots were fired at Meecie's Chevy from the direction of Marshfield. Meecie's Chevy stopped, the same young man got out of the car, and fired shots down Marshfield. The young man got back into Meecie's Chevy, and the car drove away going eastbound on 66th Street.

¶ 20                                    **James Carter's Testimony**

¶ 21        At this same time, 11-year-old Jeremiah Miggins and two other boys were doing yardwork for a neighbor. As they walked towards the gate in the front yard, two children "skipped" by and told them someone was shooting. James Carter, one of these boys, testified that, after he heard a couple gunshots, he turned to go to the backyard and saw Jeremiah on the ground holding his stomach. Jeremiah died of a single gunshot wound to his chest from a .38 caliber bullet.

¶ 22                                **Defendant's Handwritten Statement**

¶ 23        Defendant was arrested shortly after he dropped off codefendant Johnson along with Meecie's car at Meecie's house, and while driving his own car and was eventually brought to the police station. Subsequently, defendant waived his *Miranda* rights and provided a handwritten statement.

The statement said that defendant was a member of the Gangster Disciples street gang. On August 21, 1991, he was working at J's Garage. Around 10:30 a.m., Lamont Jones (Jones), a member of the C/Notes who was armed with a nine-millimeter pistol, came to the garage and told defendant not to sell drugs at that corner. An hour later, Jones, still armed with the nine-millimeter pistol, approached defendant at a nearby pay phone. Jones told him that he needed to use the phone to call the head of his gang because defendant's friend, codefendant Johnson, had just beaten Jones and Jermaine. Jones told defendant, "[s]omebody is going to die today."

¶ 24    Defendant then went to Johnson's house at 62nd and Honore. While there, Eric Clark (Clark), who had previously borrowed codefendant Johnson's 88, said that he had abandoned codefendant Johnson's 88 because Lamont Jones and another person shot at him near 66th and Laflin. Defendant agreed to take codefendant Johnson to 66th and Laflin to retrieve codefendant Johnson's 88. They decided to take the car belonging to their friend "Meecie," and not defendant's car, because the C/Notes were familiar with his car. Codefendant Johnson armed himself with a gun because he and defendant "anticipated trouble." Codefendant Johnson wrapped the gun in a blue towel and put it on the floor of Meecie's Chevy.

¶ 25    At approximately 1:00 p.m., defendant and codefendant Johnson arrived at 66th and Laflin, but did not see codefendant Johnson's 88. They spoke with defendant's brother, Charles Anderson (Charles). Charles told them that he had seen Jones and another person shooting at Eric Clark as Clark was running away from codefendant Johnson's 88. Charles saw Jones and Jermaine jump into codefendant Johnson's 88 and drive away.

¶ 26    Defendant and codefendant Johnson drove to 66th and Marshfield in Meecie's Chevy, at which point, Meecie's Chevy stalled. Defendant saw some C/Notes standing on 66th and Marshfield. Codefendant Johnson exited Meecie's Chevy, ran southbound in the alley, and then through a

gangway towards Marshfield. After hearing two gunshots, defendant drove to the middle of the intersection at 66th and Marshfield and waited for codefendant Johnson. Defendant heard four more gunshots. Defendant saw Michael Sutton standing with his arm stretched out "as if he were shooting." Codefendant Johnson got back into Meecie's Chevy and fired one more shot at Sutton. Sutton returned fire as defendant and codefendant Johnson drove away from the scene. They drove east on 66th Street and back to "Meecie's" house, where defendant retrieved his own personal car. While he was driving home, he was stopped by the police and arrested.

¶ 27                                    **Police Investigation**

¶ 28        Chicago Police Detective John Halloran investigated the scene and saw a flowerpot in front of 6608 South Marshfield Avenue. The police did not recover any bullet casings from that area or around the intersection of 66th and Marshfield Avenue. The parties stipulated to the forensic evidence, including a "38 Special discharge cartridge casing" recovered from the front of 6621 South Marshfield. The bullet recovered from Jeremiah Miggins' body was identified as a "357 Special caliber bullet with six lands and grooves with a right-hand twist." Eric Clark led the police to an abandoned car, and a 22 caliber Ruger firearm was recovered from the inside of that car. It was stipulated that this firearm was not capable of firing the bullet recovered from Jeremiah Miggins' body.

¶ 29                                       **Defense Case**

¶ 30        During the defense case, defendant attempted to call codefendant Johnson as a witness, but codefendant Johnson's counsel informed the trial court that Johnson was invoking his Fifth Amendment right against self-incrimination.

¶ 31        Defendant testified on his own behalf.  He testified consistently with his handwritten statement as to the confrontation with Jones and the conversation with Eric Clark. He also said that he and

codefendant Johnson took Meecie's Chevy to retrieve codefendant Johnson's 88. He stated that when he and codefendant Johnson got to the alley, Meecie's Chevy stalled momentarily, and codefendant Johnson went southbound in the alley towards where Johnson's 88 was parked in the alley. Defendant saw that codefendant Johnson had a gun with him. Defendant testified that he knew that codefendant Johnson kept a gun in his car, so he "kind of figured that he put it in ['Meecie's car.]" Instead of continuing towards Johnson's 88, codefendant Johnson went through a gangway. At that point, defendant heard shots fired. Defendant drove Meecie's Chevy to the intersection of 66th and Marshfield and saw codefendant Johnson running towards him. Codefendant Sutton was shooting at codefendant Johnson. Before codefendant Johnson got back into Meecie's Chevy, codefendant Johnson fired one shot back at codefendant Sutton. While they drove away, codefendant Sutton was still shooting at them.

¶ 32    Charles Anderson, defendant's brother, testified that when he was around 66th and Laflin, he saw Jones and another male shooting at Eric Clark as he was driving codefendant Johnson's 88. Clark jumped out of codefendant Johnson's 88 and ran away. Jones and the other male jumped into codefendant Johnson's 88 and drove towards Marshfield Avenue. Approximately 30 minutes later, Charles saw defendant driving Meecie's Chevy and codefendant Johnson was the passenger in the car. Charles ran up to Meecie's Chevy and asked defendant if he was looking for codefendant Johnson's 88. He told him that "Lamont and Old Boy" had shot at Eric Clark, chased him out of codefendant Johnson's 88, and went in the direction of Marshfield Avenue.

¶ 33    During closing arguments, defense counsel argued that Anthony Wilson, Steven Crosby, and codefendant Sutton initiated the gunfire in the alley because they had the motive to shoot, but Johnson did not have a motive to shoot them. Defense counsel also argued that the evidence did not support a finding that defendant was accountable for the acts of codefendant Johnson.

¶ 34    In finding defendant guilty, the trial court made the following findings in pertinent part:

> "[T]he evidence shows clearly that [defendant] took an active part in this particular shooting, he was not just there. The fact the evidence shows the movement of the car, the placement of the car. The statement itself indicates that [defendant] knew what was going on with the shooting. And the Court believes that Mr. Sutton along with Mr. Anderson went there for the purpose of a shooting, to do harm to those other individuals."

¶ 35                                    **B. Direct Appeal**

¶ 36    Defendant challenged his conviction on direct appeal asserting that the State had failed to prove him guilty beyond a reasonable doubt. We affirmed defendant's convictions and sentences. *See People v. Anderson*, No. 1-95-0500 (May 17, 1996) (unpublished order under Illinois Supreme Court Rule 23). We found that "[d]efendant's actions and post-arrest statement support the trial court's findings that defendant knew the codefendant was armed and intended to commit a shooting, and that defendant actively participated in the offense by driving the getaway car."

¶ 37                              **C. Prior Postconviction Petitions**

¶ 38    Defendant filed three prior post-conviction petitions, which this Court summarized in an opinion affirming the dismissal of his fourth post-conviction appeal. *People v. Anderson*, 401 Ill.App.3d 134, 136 (1st Dist. 2010). On November 13, 2006, defendant filed a fourth postconviction petition, which was originally filed as a section 2-1401 petition to vacate judgment. *Anderson*, 401 Ill.App.3d at 137. One of defendant's claims was that he was actually innocent of the offenses of first degree murder and attempt first degree murder. In support, defendant attached the affidavit of his codefendant, Jerome Johnson, dated July 26, 2006. Defendant argued that codefendant Johnson's affidavit "taken as true, establish[ed] that defendant had no knowledge that Johnson was armed, and Johnson only fired his weapon in self-defense." *Id*. at 138.

¶ 39    In his affidavit, codefendant Johnson attested:

- On August 21, 1991, he let Eric Clark borrow his blue Delta 88, and Clark later told him that he left the car at 66th and Laflin because Lamont Jones and Jermaine Crosby were shooting at him. Codefendant Johnson asked defendant to drive him to that area to retrieve the car and suggested that they take a car belonging their friend, "Mecie[.]"

- He saw codefendant Sutton, Anthony Wilson, and Steven Crosby standing on the corner of 66th Street.  Codefendant Johnson did not know these men so he "never really looked at them twice" while driving by.

- When they arrived at 66th and Laflin, Johnson's 88 was missing. They drove down the alley, and a man told them that Lamont Jones and Jermaine Crosby had stolen Johnson's 88 and was going towards Marshfield with it.

- Upon driving to that area, he saw his car in the alley, but when they got to 66th Street, Meecie's Chevy "died out." Codefendant Johnson exited Meecie's Chevy and walked towards Johnson's 88. "When these guys saw I was going into [Johnson's 88] they started shooting at me."

- At that point, codefendant Johnson went back to Meecie's Chevy when "these guys came out the gangway while shooting at me." Codefendant Johnson attested that he fired one shot, entered Meecie's Chevy, and defendant drove away. Codefendant Sutton continued to shoot at them as they drove away.

- He further attested that defendant did not "aid or abet me[,]" or "encourage" him. Both did not plan for a shooting.

¶ 40    In affirming the trial court's denial of leave to file his successive postconviction petition, we found that defendant was convicted under an accountability theory and codefendant Johnson's

affidavit was "cumulative of defendant's testimony at trial – that defendant drove him to retrieve his vehicle and that they did not plan on a shooting." *Id*. at 141. We also found that this affidavit did not meet the standard for evidence of such conclusive character as laid out in *People v. Collier*, 387 Ill.App.3d 630 (1st Dist. 2008) ("[T]he hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.'"), and followed in *People v. Ortiz*, 235 Ill.2d 319 (2009).

¶ 41                                          **D. Prior Section 2-1401 petition**

¶ 42        On June 21, 2010, defendant filed a motion to vacate his murder judgment.  He repeated the argument that he made in his prior appeal, that his first degree murder conviction was grounded on an incorrect theory of the law when it was based upon his accountability for an adversary. On review, defendant's motion was treated as a Section 2-1401 petition to vacate a void judgment. On May 20, 2013, this court affirmed the circuit court's dismissal of defendant's petition pursuant to the preclusion doctrine of *res judicata*. *People v. Anderson*, 2013 IL App (1st) 111059-U. In doing so, this court rejected defendant's argument that *res judicata* did not apply because, although he raised this claim in a previous petition, it was not "actually decided." *Id*. at ¶ 17.

**E. Current Postconviction petition**

¶ 43        On March 2, 2011, defendant filed the current petition, a combined petition seeking relief under both the Illinois Post-Conviction Hearing Act and Section 2-1401 under the Illinois Code of Civil Procedure. (725 ILCS 5/122-1 *et seq*. (West 2006)) and (735 ILCS 5/2-1401 (West 2008)).  The current petition is defendant's fourth successive postconviction petition. While defendant's petition largely focused on allegations of torture during his police interview, defendant made another claim of actual innocence as well as a claim that the police purposefully lost evidence that supported his innocence. Defendant alleged: "There exists newly discovered evidence of the petitioners' [sic] actual innocence of the murders of Jeremiah Miggins and Kathryn Miles. The

new evidence is of such a conclusive character that it would probably change the result on retrial…"[2] He attached the same affidavit of codefendant Johnson that he attached to his fourth successive postconviction petition, as well as the affidavit of Bertrum Anderson (Bertrum), an alleged eyewitness to the shooting. Defendant's torture claim was sent to the Illinois Torture Inquiry and Relief Commission (TIRC) for review.

¶ 44                                **Bertrum Anderson's Affidavit**

¶ 45        In his affidavit, dated November 18, 2010, Bertrum averred:

- He was on the corner of 66th and Marshfield with Tamu Brookes, Steven Crosby, Anthony Wilson, codefendant Michael Sutton, and Troy when Lamont Jones and Jermaine Crosby drove up Johnson's 88. They parked the car in the alley and approached the group.

- Jones and Jermaine Crosby told them that they had stolen codefendant Johnson's 88 after getting into a fight with him. At that point, codefendant Sutton retrieved a brown paper bag and Jones told the group that there were two guns inside the paper bag because he knew that codefendant Johnson would be coming to look for Johnson's 88.

- Anthony Wilson removed one of the guns, put it into his belt, and returned the paper bag with the other gun to codefendant Sutton. Codefendant Sutton then put the bag into a nearby flowerpot. Codefendant Sutton then told the group that if codefendant Johnson and defendant came to get the car, "we're going to kill them." Bertrum told the group that he did not want to be involved because defendant "isn't into gang banging all he do is fix cars down the street from my house…"

---

[2] Prior to the instant trial and in another case, defendant pled guilty to the first degree murder of Kathryn Miles in case number 91CR 22152.

- Ten minutes later, codefendant Sutton retrieved one of the guns from the flowerpot and put it in his belt. Bertrum then heard Sutton and Wilson say "there goes George[,]" and saw Meecie's Chevy stalled at the alley on 66th Street.

- He then saw codefendant Sutton, Wilson and Steven Crosby run through the gangway. Bertrum stayed with Tamu Brooks and Tony, looked down the gangway, and saw codefendant Johnson enter Johnson's 88. He saw codefendant Sutton and Wilson shooting at codefendant Johnson.

- Codefendant Johnson pointed his gun at them, at which point, they turned around and started running back through the gangway. Steven Crosby was then shot. Bertrum, Tamu Brooks and Troy helped Steven Crosby to the home of Wilson's aunt.

- Bertrum, Tamu and Troy returned to the corner, and Bertrum saw codefendant Johnson running on 66th Street towards Ashland. Defendant stopped Meecie's Chevy on the corner of Marshfield, and as codefendant Johnson entered the car, codefendant Sutton shot at him. Codefendant Johnson returned fire one time, and then he and defendant drove away. Codefendant Sutton continued to shoot at Meecie's Chevy as it was leaving.

- After the shooting, "we" went back to the home of Wilson's aunt to check on Steven Crosby. At that time, Steven Crosby said that codefendant Sutton shot him. Wilson told Steven Crosby to stop saying that "because we can put all of this on Jerome."

- Chicago Police Detectives Halloran and John Smith interviewed Bertrum Anderson, Tamu Brooks, Troy and codefendant Sutton. Codefendant Sutton told Detective Smith that he knew who did this and he could take them to where they were at. Codefendant Sutton left with Detective Smith and two other police officers. Bertrum Anderson told Detective Halloran everything that he stated in this affidavit.

- "Detective Halloran and Smith never called any us to the Police Station so we thought [they] found out what happened that day, but they didn't this is why I'm coming forward now, plus I never thought that [codefendant Johnson] and [defendant] would get convicted of that, because we knew as well as everyone else out there that day that [codefendant] Sutton and Anthony Wilson had planned to kill [codefendant Johnson] and [Anderson] if they came to get that car and me, Troy and Tamu [Brooks] didn't want to have anything to do with killing anyone."

¶ 46    On November 23, 2011, the Honorable Matthew Coghlan denied the 2-1401 petition and denied leave to file a successive postconviction petition. As to defendant's claim of actual innocence, the trial court found that defendant, while arguing that the "new evidence is of such conclusive character that it would probably change the result on retrial[,]" defendant "does not state what this evidence is." As a result, the trial court found that defendant could not establish his actual innocence claim where the evidence was not of such conclusive character that it would probably change the result on retrial. As to his claim that the prosecution violated the requirements of discovery pursuant to *Brady*, the trial court found that the state cannot be found to have failed to disclose information in violation of *Brady* where defendant has argued that this evidence is also new. Further, the trial court found that the record refutes his torture claim where he testified at trial that he had been treated well by the police.

¶ 47    Defendant appealed but this case was held in abeyance while the TIRC continued its review of defendant's torture claim. On June 13, 2012, the TIRC found sufficient evidence to merit judicial review of his claim of police torture. The case was sent back to the trial court to hold an evidentiary hearing. On January 16, 2020, after holding an evidentiary hearing pursuant to the TIRC Act (775

ILCS 40/50(a)), the circuit court denied defendant's request to vacate his conviction or for a new trial.

¶ 48    Defendant now appeals the denial of leave to file his fourth successive postconviction petition relating to his claims of actual innocence and the prosecution's violation of *Brady* by withholding evidence.

¶ 49                                   ANALYSIS

¶ 50                              **I. Actual Innocence**

¶ 51    At issue here is the circuit court's denial of defendant's motion for leave to file a successive postconviction petition under the Act (725 ILCS 5/122-1 *et seq*. (West 2014)). The Act provides a statutory mechanism for a criminal defendant to assert that there was a substantial denial of his or her rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 122-1(a)(1) (West 2014). The Act contemplates the filing of only one petition. *People v. Jackson*, 2012 IL 124818, ¶ 27; 725 ILCS 5/122-3 (West 2014) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.") Prior to filing a successive postconviction petition, a petitioner must obtain leave of the circuit court. *Robinson*, 2020 IL 123849, ¶ 43.

¶ 52    However, the bar against a successive filing will be relaxed in two situations. A defendant may relax the bar by raising a constitutional claim satisfying the cause-and-prejudice test. *Jackson*, 2012 IL 124818, ¶ 27; see also 725 ILCS 5/122-1(f) (West 2014). Alternatively, the second basis to relax that bar against a successive postconviction petition is "what is known as the 'fundamental miscarriage of justice' exception.'" *People v. Edwards*, 2012 IL 111711, ¶ 22. "In order to demonstrate a miscarriage of justice to excuse the application of the procedural bar, a petitioner must show actual innocence." *Edwards*, 2012 IL 111711, ¶ 23. "A request to file a successive

petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage of an initial petition, which only requires that the petition is not frivolous or patently without merit." *Robinson*, 2020 IL 123849, ¶ 43. On the other hand, defendant need not yet, at this stage, make a substantial showing of actual innocence, the showing a defendant must make at the second stage of postconviction proceedings. *Id.*

¶ 53    With respect to those seeking to relax the bar against successive postconviction petitions based on actual innocence, the supreme court has held that "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petitioner that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Edwards*, 2012 IL 111711, ¶ 24. At the pleading stage, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Robinson*, 2020 IL 123849, ¶ 45.  An allegation is positively rebutted by the trial record only if it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively an incontestably demonstrated to be false or impossible." *Id.* at ¶ 60. Also, unless the allegation is so spurious that every reasonable trier of fact would reject it, when deciding as to the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. *Id.* at ¶ 45. The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13 (citing *People v. Wrice*, 2012 IL 111860, ¶ 50).

¶ 54    For a claim of actual innocence, the supporting evidence must be newly discovered, material and not cumulative, and of such conclusive character that it would probably change the result on retrial. *Jackson*, 2021 IL 124818, ¶ 41 (citing *Robinson*, 2020 IL 123849, ¶ 47). "This is a comprehensive approach where the court must determine whether the new evidence places the

evidence presented in the underlying proceedings in a different light and 'undercuts the court's confidence in the factual correctness' of the conviction. *People v. Reed*, 2020 IL 124940, ¶ 49 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 97). Because probability and not certainly is the key, the new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 55                          ***Res Judicata* and Collateral Estoppel**

¶ 56        Before we reach the merits of defendant's claim, we point out that defendant previously raised this claim of actual innocence in a prior successive petition and was unsuccessful. Both parties ask for this court to determine whether defendant is prevented from raising this claim in the current petition under the preclusion doctrine of *res judicata*. The State argues that defendant is prohibited from raising this issue pursuant to *res judicata.* On the other hand, defendant argues that the preclusion doctrine of *res judicata* should be relaxed because there was a change in the law, in *Robinson,* regarding the standard utilized to review actual innocence allegations on postconviction proceedings. In response, the State argues that *Robinson* did not change the law regarding the standard utilized to review an actual innocence allegation, but merely recognized that the law had previously been misconstrued.

¶ 57        While both parties characterize the issue under the preclusion doctrine of *res judicata*, our analysis should be focused on the preclusion doctrine of collateral estoppel. Collateral estoppel bars the relitigation of a particular issue that was already decided in a prior case. *People v. Williams*, 392 Ill.App.3d 359, 368 (1st Dist. 2009); citing *People v. Tenner*, 206 Ill.2d 381 (2002). Collateral estoppel applies when: (1) the court rendered a final judgment in the prior case; (2) the parties are the same or in privity; and (3) the issue decided in the prior case is identical to the issue in the instant case. *Williams*, 392 Ill.App.3d at 368. The Illinois Supreme Court has applied

collateral estoppel to bar the consideration of an issue in a successive postconviction petition if the identical issue was decided in a prior postconviction petition proceeding. *Tenner*, 206 Ill.2d at 396. However, "[w]here a defendant presents newly discovered, additional evidence in support of a claim, collateral estoppel is not applicable because it is not the same 'claim.'" *People v. Ortiz*, 235 Ill.2d 319, 332 (2009) (citing *Tenner*, 206 Ill.2d at 397-98; *People v. Enis*, 163 Ill.2d 367 (1994); *People v. Armstrong*, 56 Ill.2d 159, 161 (1973); *People v. Williams*, 392 Ill.App.3d 359, 368 (1st Dist. 2009)). In *Ortiz*, the State also argued that the defendant should be precluded from raising an actual innocence claim in his second successive postconviction petition where he previously raised the same claim in his initial postconviction petition and in his first successive postconviction petition. The Supreme Court found that defendant was not precluded from raising this claim for a third time. *Id*. at 332-33.

¶ 58    Therefore, in the instant case, defendant is not precluded from raising a claim of actual innocence where he attached the affidavit of codefendant Johnson, as well as the affidavit of Bertrum Anderson to his latest postconviction petition, so that it is not the same claim as raised in his previous postconviction petition. Therefore, the analysis turns on whether the affidavit of Bertrum Anderson constitutes newly discovered evidence of actual innocence.

¶ 59                                    **Newly Discovered Evidence**

¶ 60    Defendant argues that he has shown that codefendant Johnson's and Bertrum's affidavits are newly discovered because they "only came forward after trial." However, defendant's argument is only part of the analysis in determining whether evidence is newly discovered. Within the context of an actual innocence claim, "newly discovered evidence" means evidence that was discovered after trial *and* that petitioner could not have discovered earlier through the exercise of due diligence. *Jackson*, 2021 IL 124818, ¶ 42 (citing *Robinson*, 2020 IL 123849, ¶ 47).

¶ 61     Initially, both codefendant Johnson's and Bertrum's affidavit are dated after defendant's trial. Defendant was tried in November of 1994. Codefendant Johnson's affidavit is dated July 26, 2006, and Bertrum's affidavit is dated November 18, 2010. Codefendant Johnson's affidavit meets the requirements of being newly discovered where the record shows that defendant attempted to call codefendant Johnson as a witness during the trial, but codefendant Johnson's counsel informed the trial court that codefendant Johnson was invoking his Fifth Amendment right against self-incrimination.[3]     Under these facts, even though defendant clearly knew that codefendant Johnson was a witness, because codefendant Johnson was a codefendant who invoked his fifth amendment right to avoid self-incrimination, "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *People v. Edwards*, 2012 IL 111711, ¶ 38, citing *People v. Molstad*, 101 Ill.2d 128, 135 (1984).

¶ 62     Bertrum was an acquaintance of codefendant Sutton as they both belonged to the same gang. Defendant belonged to a rival gang. On the one hand, a clear reading of Bertrum's affidavit shows that he previously knew defendant as he knew where defendant worked and easily identified him as the driver of the car. On the other hand, there is no evidence that defendant previously knew Bertrum, knew that Bertrum was there that day, or knew that Bertrum had witnessed the initial shooting in the gangway as well as the shooting that occurred afterwards. Defendant was inside Meecie's Chevy when the initial shooting occurred in the gangway. He remained inside Meecie's Chevy when the subsequent shots were fired as he and Johnson was leaving the scene. Defendant was not close to Bertrum's location on the street at that time. Moreover, there is no evidence that

---

[3] We take judicial notice that, according to the Illinois Department of Corrections records on its website, Jerome Johnson was found guilty of first degree murder and aggravated battery with a firearm in 91 CR 22460. *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n. 3. (Supreme Court relied upon the Illinois Department of Corrections website to determine whether the defendant was currently incarcerated).

Bertrum's name was included in a police report, and there is no reference to Bertrum in either side's Answers to Discovery. In addition, Anthony Wilson and Steven Crosby were both asked at trial who they were with that day, and they both did not include the name of Bertrum Anderson. Accordingly, we find that defendant has carried his burden of demonstrating that Bertrum Anderson's affidavit was newly discovered evidence.

¶ 63                              **Material and Noncumulative Evidence**

¶ 64        Regarding the element of materiality, evidence is material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Defendant argues that the affidavits are material because they address the disputed issue of who fired the first shots. In its brief, the State does dispute that this evidence is material.

¶ 65        Defendant also has the burden of establishing that the affidavits of codefendant Johnson and Bertrum were noncumulative. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* We agree with defendant's argument that this new evidence is noncumulative where defendant theorized at trial that codefendant Johnson was not the first person to shoot while he was in the gangway with Anthony Wilson and Steven Crosby, but he was unable to support this theory with any evidence. See *People v. Ross*, 2015 IL App (1st) 120089, ¶ 34, citing *Ortiz*, 235 Ill.2d at 335-36 (noncumulative where "[n]o other defense witness at trial offered the evidence presented by [the affiant]."

¶ 66                              **Conclusive Character of the Evidence**

¶ 67        The remaining issue then is whether codefendant Johnson's and Bertrum's affidavit were conclusive enough to necessitate second-stage proceedings. In *Robinson*, our supreme court clarified that the "conclusive character" of newly discovered evidence necessary to support a postconviction petition based on actual innocence does not mean that the new evidence must be

entirely dispositive or completely exonerate the defendant. *Robinson*, 2020 IL 123849, ¶ 48. Ultimately, the question is whether the evidence supporting the post-conviction petition "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* at ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 68     Defendant asserts that these affidavits establish his actual innocence for first degree murder and attempt first degree murder because it conclusively shows that codefendant Johnson acted in self-defense under the reasonable belief that his life was in danger. Section 7-1(a) of the Code (720 ILCS 5/7-1(a) (West 2010). To raise a claim of self-defense, the defendant must present evidence that (1) he was threatened with force; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; and (5) he 'actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary"; and (6) his beliefs were reasonable. *People v. Morgan*, 187 Ill.2d 500, 533 (1999).

¶ 69     Defendant focuses on the confrontation that occurred in the gangway and the shooting that commenced thereafter. On the other hand, the State argues that defendant cannot use the justification of self-defense or defense of others where the evidence shows that he and codefendant Johnson were the initial aggressors. The State relies upon the evidence presented at trial showing that there was an ongoing feud between the C/Notes and the Gangster Disciples and, that day, codefendant Johnson had beaten up Jones, belonging to a rival gang; after which Jones told defendant that "[s]omebody is going to die today"; then Jones shot at Eric Clark while Clark was driving codefendant Johnson's 88; and defendant drove codefendant Johnson in Meecie's Chevy

to the area where codefendant Johnson's 88 was located, with codefendant Johnson armed with a gun.

¶ 70    In accordance with *Robinson*, we must determine whether codefendant Johnson's and Bertrum's affidavits are positively rebutted by the record, keeping in mind that "positively rebutted" means that "no fact finder could ever accept the truth of that evidence such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. We must also determine whether the new evidence is of such conclusive character that it would probably lead to a different result on retrial. Under the *Robinson* standard, we consider whether the affidavit "raise[s] the probability that it is more likely than not that no reasonable juror would have convicted [defendant]." *Id.* at ¶ 61. Thus, we consider the new evidence in light of the trial evidence.

¶ 71    Looking at the trial evidence and the new evidence together, there is a probability that the outcome of defendant's trial would be different on retrial. As to the events leading up to the shooting, defendant admitted that he purposely drove a car belonging to a friend, Meecie's Chevy, so that he and codefendant Johnson would be less likely to be recognized, knew that codefendant Johnson was armed with a gun because they "anticipated trouble[']" with Lamont Jones, knew that codefendant Johnson and Lamont Jones had previously fought, and knew that Lamont Jones had threatened defendant to stop selling drugs while he was armed with a gun. Neither of these affidavits contradict the evidence of the events leading up to the shooting. In fact, codefendant Johnson's affidavit does not say anything about whether he was armed with a gun when they left to retrieve his car. Moreover, neither of these affidavits contradict the evidence showing that, after the shooting, defendant drove Meecie's Chevy, the getaway car, after witnessing an exchange of gunfire involving codefendant Johnson.

¶ 72     Both codefendant Johnson and Bertrum's affidavits, however, present new evidence that codefendant Johnson did not fire the initial shots during the confrontation in the gangway. Wilson testified that codefendant Johnson was the first person to shoot and neither he nor Steven Crosby were armed at this time. Likewise, Steven Crosby's handwritten statement, introduced substantively at trial, stated that defendant was the first person to fire the gun at them. On the other hand, Bertrum Anderson's affidavit states that he saw codefendant Sutton, Wilson and Steven Crosby run down the alley and that codefendant Sutton and Wilson both shot at codefendant Johnson before codefendant Johnson returned fire. Codefendant Johnson attested in his affidavit that he was shot at when he was trying to retrieve Johnson's 88.

¶ 73     The State does not point to any evidence, including physical evidence, presented at trial that would positively rebut the averments of codefendant Johnson and Bertrum as to who was the initial aggressor. There was forensic evidence presented at trial, however, it would not positively rebut the new evidence. No physical or forensic evidence linked codefendant Johnson to the shooting. The prosecution relied upon the eyewitness testimony of Wilson and Steven Crosby as to what occurred during the initial confrontation in the gangway. Moreover, the trial evidence would merely contradict the new evidence. *Robinson*, 2020 IL 123849, ¶ 60. (finding that it is not enough for the reviewing court to find that the new evidence contradicts the trial evidence).

¶ 74     We acknowledge that there are discrepancies between Bertrum's and codefendant Johnson's accounts of the shooting, as well as defendant's own trial testimony. While defendant testified at trial that he saw codefendant Johnson armed with a gun when codefendant Johnson exited Meecie's Chevy and went to the alley, codefendant Johnson does not admit that he possessed a gun when he was in the alley. In codefendant Johnson's affidavit, the first time that he mentioned that he had a gun was when he returned to Meecie's Chevy and fired one shot after being fired

upon by codefendant Sutton. On the other hand, Bertrum averred that, after Wilson and codefendant Sutton shot at codefendant Johnson, codefendant Johnson pulled out his gun and aimed the gun at Wilson, Crosby, Bertrum and codefendant Sutton. Moreover, while Bertrum stated that Wilson and codefendant Sutton fired their weapons at codefendant Johnson, codefendant Johnson never identified who fired the shots at him. While discrepancies exist, none would categorically preclude any trier of fact from ever accepting the veracity of the allegations. These issues do not positively rebut defendant's claim, and instead, only invite factfinding and credibility determinations. *Robinson*, 2020 IL 123849, ¶ 45; *Sanders*, 2016 IL 118123, ¶ 48 (finding the witness' new assertion that he shot the victim once, was positively rebutted by the record showing that the victim was shot twice).

¶ 75 We also recognize that some of Bertrum's and codefendant Johnson's averments constitute conclusory assertions. Codefendant's Johnson's conclusory statement that defendant did not aid, abet or encourage him, as well as Bertrum Anderson's conclusory statement that "we knew as well as everyone else out there that day that Michael Sutton and Anthony Wilson had planned to kill [Johnson] and [Anderson] if they came to get that car…" are not well-pleaded facts, but merely conclusions, unsupported by any specific facts, which we do not accept as true at this stage. *People v. Rissley*, 206 Ill.2d 403, 412 (2003) ("[N]onfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a[n] [evidentiary] hearing under the Act."); *People v. Morris*, 236 Ill.2d 345, 354 (2010) ("[A] petition alleging nonfactual and nonspecific assertions that merely amount to conclusions will not survive summary dismissal."); *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 27 (affiant's statement that it would have been "impossible" for the defendant to know that the affiant was there or had witnessed the events was a conclusion, not "a well-pleaded fact that must be taken as true.").

¶ 76    Therefore, we find that defendant has presented a colorable claim of actual innocence and remand for further proceedings on this particular claim in his successive postconviction petition.

¶ 77                                **II. *Brady* Violation**

¶ 78    Defendant also asserts that the trial court erred in denying his motion for leave to file a successive postconviction petition on the grounds that the prosecution withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He argues that he showed the requisite "cause" and "prejudice" under the Act. He asks that we reverse the trial court's order and remand for further postconviction proceedings on the successive petition.

¶ 79    Pursuant to the Act, a defendant can seek to have this court relax the bar against successive postconviction petitions by establishing "cause and prejudice" for the failure to raise the claim earlier. *People v. Davis*, 2014 IL 115595, ¶ 13. The cause and prejudice test is codified in section 122-1(f) of the Act, which provides that leave of court to file a successive petition may be granted "only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). The Act instructs that a defendant "show cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id*. A defendant "shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id*.

¶ 80    To meet the cause and prejudice test, a defendant is required to "'submit enough in the way of documentation to allow a circuit court to make that determination.' [Citation.]" *People v. Smith*, 2014 IL 115946, ¶ 35. "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted

by the petitioner, that the claims alleged by the petition fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings. [Citations]" *Id.* at ¶ 35.

¶ 81        When a defendant moves for leave to file a successive petition, the circuit court "must decide the legal question of whether a defendant has satisfied the section 122-1(f) requirement of showing cause and prejudice" which is "a preliminary screening to determine whether defendant's *pro se* motion * * * adequately alleges facts demonstrating cause and prejudice. [Citation.]" *People v. Bailey*, 2017 IL 121450, ¶ 24. If a defendant has "made a *prima facie* showing of cause and prejudice," leave to file the petition should be granted. *Id.* Satisfying the cause and prejudice test does not entitle a defendant to relief, but rather "only gives a petitioner an avenue for filing a successive postconviction petition." *Id.* (quoting *People v. Smith*, 2014 IL 115946, ¶ 29). Denial of leave to file is reviewed *de novo. Bailey*, 2017 IL 121450, ¶ 13.

¶ 82        On appeal, defendant argues his motion for leave to file the successive postconviction petition and supporting documents demonstrate cause and prejudice regarding his claim that the prosecution violated the requirements of *Brady*. Specifically, with respect to the cause element, defendant asserts he has established this element because Bertrum Anderson chose to come forward in 2010, years after defendant had gone to trial and even filed his initial postconviction petition in 1996. On the other hand, the State asserts that defendant cannot establish cause where Bertrum averred that he was available to testify from the time of the incident and, if Bertrum knew defendant and saw him driving the car at the time of the shooting, then it follows that defendant knew Bertrum and would have seen and recognized him as well.

¶ 83        In support of his position that this evidence was suppressed, defendant relies upon Bertrum's affidavit from 2010, in which he averred that he spoke with Detectives Halloran and Smith after

the shooting. He also supports his position by including a copy of a motion entitled, "Motion to Compel Discovery." In that motion dated in 1995, defense counsel for a codefendant Johnson, represented to the trial court that she received copies of the police reports, but had not received any "general progress notes, street files, running notes or any hand written [sic] notes." She further represented that the prosecutor informed her that "the general progress reports were lost."

¶ 84    In this case, defendant received these supporting documents, consisting of Bertrum's affidavit and the motion filed in the codefendant's case after defendant's trial was completed, years after he filed his initial postconviction petition in 1996. He alleged that this was the first time he learned about the information that Bertrum disclosed to the police detectives, as well as information that the State had "lost" the general progress reports, which would have contained the information regarding interviews conducted by the police. We find that this evidence satisfied the "cause" element of the cause-and-prejudice test because defendant could not have raised this issue prior to him learning about this information. See 725 ILCS 5/122-1(f) (West 2018) (a defendant "shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial postconviction proceedings.")

¶ 85    With respect to prejudice, defendant asserts that he has made a *prima facie* showing of a *Brady* violation where Bertrum's proposed testimony is exculpatory, material and was withheld from him. Defendant argues that Bertrum's affidavit showed that he was interviewed by the police detectives immediately after the shooting, during which he informed them that codefendant Johnson was not the initial aggressor and only returned fire in self-defense, but the police detectives "lost" their reports and notes to cover up the information they received from Bertrum.

¶ 86    Pursuant to *Brady*, the State has a constitutional obligation to disclose evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87.

However, "the Constitution is not violated every time the government fails or chooses to not disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 415 U.S. 419, 436-37 (1995). A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *People v. Burt*, 205 Ill.2d 28, 47 (2001). The *Brady* disclosure requirement has also been codified in Illinois in Illinois Supreme Court Rule 412(c) (eff. March 1, 2001).

¶ 87    We find that defendant has established the prejudice prong where he has made a *prima facie* showing of a *Brady* violation. The undisclosed evidence, consisting of Bertram's account of the shooting, was favorable to defendant as it was exculpatory evidence directly related to his claim at trial that codefendant Johnson fired his shots in self-defense. The record also contains some evidence to support defendant's claim that this evidence was suppressed by the State, whether it was done willfully or inadvertently. See *People v. Hobley*, 182 Ill.2d 404, 438 (1998) (the law is well settled that the same *Brady* rules apply even where the suppressed evidence was known only to police investigators and not to the prosecutors). Defendant supported his claim with evidence showing that the police interviewed Bertrum regarding what he knew about the shooting, and there was also evidence showing general progress reports were allegedly "lost" in this case, although the allegation was made in a codefendant's subsequent trial.

¶ 88    We also find that defendant has sufficiently shown that he was prejudiced because the evidence was material as to defendant's guilt for first degree murder. Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Harris*, 206 Ill.2d at 311. Materiality is not the mere possibility that the undisclosed

information might have helped the defense or affected the outcome of the trial. *Stickler v. Greene*, 527 U.S. 263, 291 (1997) (stressing the difference between possibility and probability). A "reasonable probability" of a different result is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Here, defendant has shown that there is a reasonably probability that the undisclosed information – that Bertrum supported defendant's theory that codefendant Johnson fired the gun in self-defense – might have helped the defense or affected the outcome of the trial. Thus, under these facts and circumstances, defendant has established the prejudice prong under the cause-and-prejudice test for this particular claim in his successive postconviction petition. Accordingly, we find that the trial court erred in denying defendant leave to file his successive postconviction petition claim relating to *Brady* and remand for further proceedings on this particular claim.

¶ 89                                CONCLUSION

¶ 90      For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand the case to that court for further proceedings consistent with this order.

¶ 91      Reversed and remanded.